No. 99-302

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 345

303 Mont. 232

15 P. 3d 414

SHANNON CATE-SCHWEYEN and SHANNON

CATE-SCHWEYEN, as Conservator of SARA CATE,

a minor,

Petitioners and Respondents,

v.

JOANN CATE, Personal Representative of the

Estate of Jerome J. Cate,

Respondent and Appellant.

APPEAL FROM: District Court of the Eleventh Judicial District,

In and for the County of Flathead,

The Honorable Ted O. Lympus, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Eloise D. Solem Jergesen, William M. Solem, Burns, Solem & MacKenzie, Chinook, Montana

For Respondents:

Donald C. Robinson, Poore, Roth & Robinson, Butte, Montana

Submitted on Briefs: January 27, 2000
Decided: December 19, 2000

Filed:

_____

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 This is an appeal from an Order and Rationale entered by the Eleventh District Court, Flathead County, on December 14, 1998, denying Personal Representative JoAnn Cate's (JoAnn) motion for summary judgment and granting a motion for summary judgment in favor of Shannon Cate-Schweyen, individually, and as Conservator of Sara Cate, a minor (collectively referred to herein as Shannon). The Order provided that JoAnn would convey various assets to Shannon and take other actions with respect thereto, and also awarded Shannon her costs.

¶2 We reverse and remand for further proceedings consistent with this opinion.

¶3 On appeal, JoAnn raises the following issues:

   1. Whether the District Court erred in finding that the 1988 document represents a testamentary trust as opposed to an *inter vivos* trust which failed for lack of delivery of the document or the trust property to the trustee.

   2. Whether the District Court erred in finding that a testamentary trust is not subject to the homestead allowance, exempt property, family allowance, rights of creditors, elective share of the surviving spouse, and to expenses of administration.

We conclude that the first issue is dispositive, and therefore decline to address the second issue.

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 The focus of this controversy is a handwritten document drafted by Jerome J. Cate (Jerry), a practicing attorney in Montana for nearly 30 years and now deceased, entitled "Irrevocable Trust Reserving Income For Life." The document was signed by Jerry and dated January 2, 1988. Jerry died intestate on April 4, 1995.

¶5 The trust document purported to "sell, assign and convey" various mineral interests, which Jerry had inherited from his mother and her brother, to a trust for the benefit of his daughters from his first marriage, Shannon, Kristin, and Sara, with Shannon serving as trustee. Jerry reserved a life interest for himself, and then, upon his death, the three daughters would receive a term of years interest for 20 years, and then the corpus would be distributed outright to the daughters or their heirs pursuant to a "per stirpes" declaration. The trust document apparently was drafted by Jerry in anticipation of his remarriage to the Appellant, JoAnn, in February of 1988. The document reflects this, providing that "bearing in mind specifically that I intend to marry again on the 14th of February, 1988, [I] do hereby sell, assign and convey . . ." The undisputed facts show that Jerry never transferred or conveyed the named mineral interests to the trust or otherwise delivered the trust property to Shannon, the named trustee.

¶6 At the time of his death, JoAnn, in her capacity as personal representative of Jerry's estate, refused to convey the alleged trust property upon the request of the daughters. Consequently, Shannon, acting individually and as conservator for her youngest sister, Sara, filed a petition in September of 1997, requesting that the District Court declare that either an express or resulting trust in the mineral interests existed. (The eldest daughter, Kristin, is not a party to this action.) At that time, the handwritten document had not been located; rather, a 1993 bill of sale document executed by Jerry indicated the existence of the trust.

¶7 The 1993 bill of sale was executed to convey Jerry's assets to a "joint revocable *inter vivos* trust" which he drafted in 1990. The bill of sale provided: "This Bill of Sale and Assignment does not include any mineral interests owned by Jerome J. Cate, a/k/a Jerry Joseph Cate, which have heretofore been placed in trust for the benefit of Shannon and Sara Cate." Kristin's name was apparently omitted from this reference due to a rift between her and Jerry. Thus, Shannon pursued the legal theory that the referenced trust was testamentary in nature, and therefore JoAnn, as personal representative of Shannon's father's estate, must fund the testamentary trust with the mineral interests owned by Jerry at the time of his death.

¶8 Once the 1988 trust document was found, Shannon did not alter her legal theory, maintaining that the handwritten trust document was testamentary as well.

¶9 In response to Shannon's petition, JoAnn contended that the handwritten document was not a valid testamentary trust. She argued that the document intended to create an *inter vivos* trust, which Jerry never executed by conveying or otherwise transferring the interests to the trust or Shannon. Therefore, according to JoAnn, the handwritten trust document is unenforceable, and the identified mineral interests should be included within Jerry's estate.

¶10 Both parties moved for summary judgment. Following a July 29, 1998 hearing, the District Court denied JoAnn's motion for summary judgment and granted summary judgment in favor of Shannon.

¶11 The District Court concluded that to qualify as a testamentary disposition, the document need only comply with Montana's statutory requirements for a will. The court concluded that the handwritten trust document was testamentary. The court stated that "[t] he fact that Decedent chose to reserve income for life when he created the trust is not inconsistent with an intention to create a testamentary disposition." The court further concluded that the "evidence is clear, convincing and overwhelming that the intent of Decedent Jerome J. Cate was to establish a testamentary trust with his daughters to be the beneficiaries thereof." The court also ruled that "Respondent's contention that the instrument is a failed attempt to create an *inter vivos* transfer of the property is belied by the holographic nature of the instrument."

¶12 JoAnn filed a motion to amend the order so that it would reflect that the subject trust properties, if indeed testamentary, should first be subject to probate, meaning the property potentially would be reduced by various statutory allowances and exemptions. This motion was deemed denied.

¶13 JoAnn appealed.

## STANDARD OF REVIEW

¶14 This Court reviews an order granting summary judgment *de novo*, using the same Rule 56, M.R.Civ.P., criteria applied by the district court. *See Calcaterra v. Montana Resources*, 1998 MT 187, ¶ 9, 289 Mont. 424, ¶ 9, 962 P.2d 590, ¶ 9. This Court looks to

the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits to determine the existence or nonexistence of a genuine issue of material fact. *See Erker v. Kester*, 1999 MT 231, ¶ 17, 296 Mont. 123, ¶ 17, 988 P.2d 1221, ¶ 17.

¶15 Here, no material facts remain in dispute. Rather, both parties contend that they are, respectively, entitled to judgment as a matter of law, in light of the District Court's conclusion that the trust document in question was testamentary, rather than *inter vivos*. As with the judicial interpretation and construction of any instrument, the question of whether any particular language creates an express trust, given the circumstances under which the trust was executed, is a question of law for the court to decide. *See Estate of Bolinger* (1997), 284 Mont. 114, 118, 943 P.2d 981, 983 (citation omitted). Thus, accepting the facts found by the District Court, we will proceed to determine if either party was entitled to judgment as a matter of law.

## DISCUSSION

*Whether the District Court erred in finding that the 1988 document represents a testamentary trust as opposed to an* inter vivos *trust which failed for lack of delivery of the document of the trust property to the trustee.*

¶16 JoAnn argues that the trust document in dispute is *inter vivos*, rather than testamentary, and is therefore unenforceable because no property was ever transferred or conveyed to it by her deceased husband, Jerry, as required by law. Thus, the named trust property should remain in Jerry's estate, and she should be entitled to judgment as a matter of law.

¶17 Shannon contends that the District Court's conclusion that the trust document was testamentary is correct, and therefore the trust is valid because her father intended that the trust would remain "dry" until his death at which time his estate would transfer the mineral interests. Alternatively, Shannon argues that even if an express trust technically cannot be enforced, then an involuntary trust should be imposed to achieve an equitable result based on her father's clear intent expressed in the document.

¶18 The theories set forth by both parties comport with statutory law governing creation of trusts in Montana. Under § 72-33-203, MCA, a trust is created "only if there is trust property." Under § 72-33-201(2), MCA, a valid *inter vivos* trust requires that the owner transfer the subject property to a trustee during the owner's lifetime. In contrast, under

subsection (3), a valid trust may be created when the property is identified as a "testamentary transfer" to a trustee. Under § 72-33-216, MCA, a court may exercise its equitable powers and impose a "resulting trust" to fulfill the manifest intent of the trustor if the trust fails to fulfill this intent.

¶19 Further, Montana's statutory requirements generally comport with the Restatement (Second) of Trusts (1959), which often has been relied on by this Court, and has been presented as persuasive authority by the parties here. *See*, *e.g.*, *McCormick v. Brevig*, 1999 MT 86, ¶ 63, 294 Mont. 144, ¶ 63, 980 P.2d 603, ¶ 63. *See also* § 72-33-201, MCA, Official Comments; Restatement (Second) of Trusts §17 (identifying five methods of creating trusts similar to subsection (1) through (5) under § 72-33-201, MCA).

¶20 As a preliminary matter, we shall first dispense with the fundamentally flawed argument that the trust document at issue was testamentary. We conclude that as a matter of law the trust document clearly and convincingly expresses an intent to create an *inter vivos* trust that would take effect during Jerry's lifetime, notwithstanding whatever alleged misunderstandings or intentions the he may have expressed or exercised at a later date.

¶21 Our examination of the construction of the trust in question here is guided by several steadfast rules that were recently consolidated in this Court's decision in *Estate of Bolinger* (1997), 284 Mont. 114, 120-22, 943 P.2d 981, 985. First, we must seek out the trustor's "intent," so far as possible. Second, we must look to the language of the trust agreement itself to ascertain this intent. Third, the words used in the instrument are to be taken in their ordinary and grammatical sense unless a clear intention to use them in another sense can be ascertained. Finally, the burden of proof to establish the existence of a trust--or in this case a particular "kind" of trust--is upon the party who claims it, and must be founded on evidence which is unmistakable, clear, satisfactory, and convincing. *See Bolinger*, 284 Mont. at 120-22, 943 P.2d at 985 (citations and internal quotations omitted).

¶22 Removing superfluous verbiage, the handwritten document, identified as an "Irrevocable Trust Reserving Income For Life" provides:

> I Jerome J. Cate . . . do hereby sell, assign and convey all of my oil gas and mineral interests . . . to my daughter, Shannon Cate, to hold in trust for her benefit and the benefit of her sister Kristin Cate and her sister Sara Cate, as Shannon in her sole discretion shall see fit, for a period of time twenty years subsequent to the date of my death, at which time she shall distribute those mineral interests in equal

shares . . . reserving, however, to myself the income from this trust for my lifetime.

¶23 Shannon argues at length that the foregoing writing technically satisfies statutory requirements for a holographic will, and is therefore "testamentary." *See* §§ 72-2-522 and 531, MCA (providing rules for holographic wills and testamentary additions to trusts).

¶24 A testamentary trust, however, not only must comply with the statutory requirements for a will, but also must take effect "only upon the testator's death." *See* Black's Law Dictionary at 1475 (6th ed. 1990); Restatement (Second) of Trusts § 26, Comment a., and § 56 Comment b. (stating that in order for a disposition to be "testamentary," the owner of property who transfers property or deed of conveyance to trustee *inter vivos* must manifest an intention that the conveyance shall not be effective until his death). Further, in order for a document to be deemed "testamentary," generally, it also must be revocable, and the settlor or trustor must retain the property under his control during his life. *See* Black's Law Dictionary at 1474 (6th ed. 1990). Although disputed by Shannon, these general definitions actually concur with the Restatement definition which she recites in her brief: "[a] testamentary disposition of property is a disposition to take effect upon the death of the person making the disposition and as to which he has substantially entire control until his death." Restatement (Second) Trusts § 53, Comment a. This Restatement section adds that such a disposition is testamentary "whether made by a will or a document which purports to be a will or made by a transaction *inter vivos*, as by a deed, unsealed writing or parol declaration or transfer."

¶25 Thus, in order to be construed as "testamentary," a trust document must first and foremost express a clear and unmistakable intent that the trust will not take effect until the testator's death. Following this rule generally requires that the trustor retains the power of revocation, and expresses no intention to pass a present interest. *See In re Gasparovich's Estate* (1971), 158 Mont. 21, 23-24, 487 P.2d 1148, 1150 (stating "common sense" rule that the true test of the character of an instrument is not the testator's realization that it is a will, but his intention to create a revocable disposition of his property, to accrue and take effect only upon his death, and passing no present interest). Therefore, a "testamentary" disposition is usually incompatible with a trust established by a trustor who retains a life interest, as a beneficiary of the trust, although a new beneficiary or beneficiaries acquire an interest upon the trustor's death. *See generally* Restatement (Second) of Trusts §§ 56, Comment f. and 57; 76 Am.Jur.2d, Trusts §§ 33 and 88 (1992) (stating that a "reservation of a life estate or interest does not make a disposition in trust a testamentary disposition").

¶26 Suffice to say, to construe the foregoing document as "testamentary" would require an alchemist's crucible. While not nimbly drafted, the document nevertheless expresses a clear and convincing intent that it would take effect *inter vivos*, or during Jerry's lifetime. Rather than anticipating a future testamentary transfer by such common language as "give, devise, and bequeath," the transfer is that of an ordinary, present conveyance: "I . . . do hereby sell, assign and convey . . ." Further, there is no preceding or subsequent qualification of this transfer language by other language such as "upon my death" or "when I die" or "in the event of my death." Rather, the "twenty years subsequent to the date of my death" language which appears later merely serves as a fixed termination date--rather than a commencement date--for the trust itself. Although Jerry did in fact retain legal title over the trust property, he did not name himself as trustee; rather, this duty is expressly accorded to his daughter, Shannon, meaning the document expresses a clear intent that Jerry planned to divest himself of legal title over the named trust property and thereby transfer a present interest. In turn, the "income from this trust for my lifetime" language indicates that the trust would come into existence during Jerry's lifetime, and he would become the trust's first beneficiary. Finally, the document itself is identified as "irrevocable," which in light of the accompanying language indicates an unmistakable intent to pass legal title to the trust during Jerry's lifetime, and thereby remove the property from his estate.

¶27 Taken as a whole, the evidence that the trust document is testamentary does not rise to the level of being unmistakable, clear, satisfactory, or convincing. Rather, the opposite is true: the trust document convincingly displays all the attributes of an *inter vivos* transaction that the trustor intended would take place at the time the document was drafted or soon thereafter. We therefore hold that the District Court erred in concluding that Jerry Cate's handwritten trust document was testamentary.

¶28 Pursuant to JoAnn's summary judgment argument that was denied by the District Court, we next turn to the issue of "delivery" to determine whether the trust in question was ever made legally effective, or instead remained a "phantom" or "dry" trust and therefore unenforceable. *See generally McCormick v. Brevig*, 1999 MT 86, 294 Mont. 144, 980 P.2d 603.

¶29 This Court has concluded that, under the common law, in order to establish an *inter vivos* trust, there must be a transfer of property. *McCormick*, ¶ 63 (quoting Restatement (Second) of Trusts §§ 17 and 32). We quoted from the Restatement of Trusts that "if the owner of property makes a conveyance *inter vivos* of the property to another person to be

held by him in trust for a third person and the conveyance is not effective to transfer the property, no trust of the property is created." *McCormick*, ¶ 63 (quoting § 32). *See also* Am.Jur.2d, *Trusts* § 49 (1992) (stating general rule that a separation of legal title and equitable ownership of the trust property is necessary to the formation of an express trust); Am.Jur.2d, *Trusts* § 52 (1992) (stating general rule that in order to create a valid trust, there must be an actual conveyance or transfer of property).

¶30 The undisputed facts clearly reveal that Jerry never delivered, or conveyed, or otherwise attempted to transfer the identified trust property to the named trustee, his daughter Shannon, or to the trust itself with or without her knowledge.

¶31 Further, the trust document itself is insufficient to serve as an instrument of conveyance. Although the property is clearly identified in the handwritten document, we concluded under the similar circumstances described in *McCormick* that in order for a trust document to serve as an instrument of conveyance, the person executing the trust document must subsequently redeliver, confirm, ratify, or adopt the transfer. *See McCormick*, ¶ 66 (requiring "some further indication of the grantor's intent to divest himself of valuable real property" and concluding that express trust was invalid as a matter of law because there was "no proper conveyance into the trust of trust property").

¶32 The reasons for Jerry's omissions, as JoAnn indicates in her brief, are known only to Jerry. That the undisputed facts clearly show that Jerry intended to create some form of a trust that would benefit only his three daughters unfortunately does not alter the fact that he never took the affirmative legal steps necessary for the trust to become enforceable as either a testamentary or *inter vivos* trust.

¶33 Thus, we have two options, pursuant to or *de novo* review: to either agree with JoAnn and conclude that no trust existed, and therefore the property should remain in Jerry's estate, or that an involuntary or "resulting" trust, one that would carry out Jerry's intent, should be enforced, which Shannon argues would achieve a correct, equitable result. We conclude, however, that the underlying "resulting trust" equitable doctrine is entirely incongruous with the factual circumstances presented here.

¶34 An involuntary trust is a creature of equity, where a court imposes or creates a trust to work an equitable result. *See Eckart v. Hubbard* (1979), 184 Mont. 320, 326, 602 P.2d 988, 991. Under § 72-33-216, MCA, a court may exercise its equitable powers and impose a "resulting trust" to fulfill the manifest intent of the trustor if the trust fails to fulfill this

intent. However, as a matter of law, such a "resulting trust" creates an equitable reversionary interest whereby the original transferor or his heirs become the beneficiary of the trust. *See Eckart*, 184 Mont. at 327, 602 P.2d at 992. *See also* Restatement (Second) of Trusts § 404 and Chapter 12 Introductory Note (stating that the beneficial interest "springs back or results to the person who made the disposition or to his estate, and the person holding the property holds it upon a resulting trust for him or his estate"). To illustrate, Jerry could have created a trust as specified in his handwritten document and properly transferred the property. Upon his death, if the beneficiaries did not survive him and left no issue, the trust would have "failed" pursuant to its own terms because no subsequent beneficiaries were named. *See* § 72-33-216, MCA. As an equitable remedy, the "resulting" remainder would revert to Jerry's estate, although this specific transfer of interest was not expressed in the trust document.

¶35 Thus, even if we were to impose a resulting trust, as Shannon argues, the property would nevertheless revert to Jerry's estate. This result is no different, therefore, than if we concluded that no trust exists. *See Eckart*, 184 Mont. at 328, 602 P.2d at 992 (describing identical circumstances and concluding that trust property must be returned to trustor's estate).

¶36 The other type of a involuntary trust, the constructive trust, which is based on the equitable remedy of unjust enrichment--i.e., the plaintiff brings a suit to enforce a constructive trust seeking to recover specific property--was not argued by Shannon, and is therefore not available as an equitable remedy. *See* § 72-33-219, MCA (providing that a constructive trust arises when a person holding title to property is subject to an equitable duty to convey it to another on the ground that the person holding title would be unjustly enriched if he were permitted to retain it).

¶37 Accordingly, we conclude that the *inter vivos* trust document at issue failed due to the lack of a transfer of property to the trust during Jerry Cate's lifetime, and therefore no enforceable trust existed. Based on this conclusion, we hold that the District Court erred when it determined that Shannon was entitled to judgment as a matter of law, and denied JoAnn's motion for summary judgment.

¶38 This matter is reversed and remanded for further proceedings consistent with this opinion.

/S/ JAMES C. NELSON

We Concur:

/S/ KARLA M. GRAY

/S/ WILLIAM E. HUNT, SR.

/S/ TERRY N. TRIEWEILER

Chief Justice J. A. Turnage, dissenting.

¶39 I respectfully dissent from the majority opinion.

¶40 The District Court concluded that the handwritten trust document executed by Jerome Cate met the requirements of the Montana Statute of Wills and would be valid as a holographic will. It further concluded that JoAnn Cate had produced no persuasive authority that an otherwise valid testamentary disposition which was never revoked is invalid simply because the testator chose to designate the disposition as "irrevocable."

¶41 Under long-settled rules of construction of testamentary instruments, including trusts, the testator's intent controls. *See, e.g., Estate of Bollinger* (1997), 284 Mont. 114, 120-21, 943 P.2d 981, 985. On this record, Jerome Cate's intent is crystal clear--to create a testamentary trust for his daughters. The reason for that intent is also clear--to pass on to his blood descendants mineral interests which he himself had inherited from his mother and her brother as part of his family legacy. If the majority cannot discern that intent, then their vision is fogged.

¶42 I would affirm the decision of the District Court.

/S/ J. A. TURNAGE

Justice W. William Leaphart, dissenting.

¶43 I join in the dissent of Chief Justice Turnage and add the following considerations as bearing upon my conclusion that the District Court was correct in concluding that this document was a valid holographic testamentary trust:

¶44 1.  The author, in typical precatory and testamentary fashion, characterizes himself as being of "sound and disposing mind[.]"

¶45 2.  Cate was cognizant that he was about to marry a woman whom he had known for less than a month and that by his marriage to her he would have stepchildren whom he barely knew.

¶46 3.  The language "twenty years subsequent to the date of my death," indicates both a commencement date (date of death) and a fixed termination date, twenty years thereafter.

¶47 4.  Cate, an experienced attorney, knew how to fund an inter vivos trust but did not do so here.

¶48 5.  Cate used a testamentary reference to the distribution of the mineral interests to his daughters "or their heirs per stirpes[.]"

¶49 6.  Cate died leaving no formal last will and testament.

¶50 7.  The beneficiaries of the testamentary trust were his daughters; his natural heirs and expected recipients of the mineral interests he had inherited from his mother and uncle.

¶51 8.  As typical with holographic documents, the document is handwritten and not notarized.

¶52 Although there are certainly other provisions in the document which lend themselves to a contrary interpretation, when the document is read as a whole and in light of the circumstances under which it was executed, it is clear to me that Cate intended it to be testamentary in nature. Accordingly, I respectfully dissent.

/S/ W. WILLIAM LEAPHART

Justice Jim Regnier joins in the foregoing dissenting opinion.

/S/ JIM REGNIER