# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2016-CA-00668-COA

| | |
|---|---|
| IN THE MATTER OF THE CONSERVATORSHIP OF CHARLES ADDISON: CYNTHIA SHENELL JACKSON A/K/A CYNTHIA ADDISON JACKSON | APPELLANT |

v.

| | |
|---|---|
| DOUG TOUCHSTONE, CONSERVATOR, WILLIAM ADDISON A/K/A WILLIE ADDISON, AND AUBREY ADDISON | APPELLEES |

| | |
|---|---|
| DATE OF JUDGMENT: | 11/18/2015 |
| TRIAL JUDGE: | HON. DEBBRA K. HALFORD |
| COURT FROM WHICH APPEALED: | AMITE COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | SANFORD E. KNOTT |
| ATTORNEYS FOR APPELLEES: | ALTON LAMAR WATTS |
| | GARY L. HONEA |
| | JOHN BENJAMIN ROWLEY |
| | TODD BRENTLEY OTT |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS, AND ESTATES |
| DISPOSITION: | REVERSED AND RENDERED - 01/09/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE LEE, C.J., WILSON AND WESTBROOKS, JJ.**

**WILSON, J., FOR THE COURT:**

¶1.     This is a case about joint ownership of bank accounts and certificates of deposit. From 1975 to 1999, Charlie Addison made his daughter, Cynthia Addison Jackson, a joint owner of several of his bank accounts and CDs.  Cynthia was still in high school when Charlie opened the first of these accounts.  In 2011, Charlie's mental and physical health had declined, and he needed a conservator.  The chancellor appointed Cynthia conservator of

Charlie's person and appointed the Pike County Chancery Clerk conservator of Charlie's estate. The chancellor also ordered the funds in the joint accounts and CDs to be transferred to a conservatorship account for "safekeeping." Cynthia appealed, arguing that the chancellor should have appointed her conservator of her father's estate. However, Charlie passed away while the appeal was pending. Cynthia and the conservator then filed a joint motion to dismiss the appeal as moot, which this Court granted.

¶2. After Charlie's death, Cynthia filed a motion in the chancery court requesting the return of the funds that had been transferred to the conservatorship account. She maintained that she was the rightful owner of the funds as the surviving joint owner of the accounts and CDs from which they had been transferred. The chancellor denied Cynthia's motion and ruled that the funds were the property of Charlie's estate. Cynthia appealed.

¶3. We hold that Cynthia was a joint owner with rights of survivorship of the funds held in the joint accounts and CDs, that her interest in the funds was not destroyed by their transfer to conservatorship accounts, and that she did not abandon her claim to the funds when she agreed to dismiss her prior appeal as moot. Accordingly, we reverse and render judgment in favor of Cynthia.

## FACTS AND PROCEDURAL HISTORY

¶4. Charlie and his wife, Margie Mae, had two sons, Aubrey Addison and Willie Addison, and one daughter, Cynthia. Cynthia is fifty-eight years old and has lived in Pike County or Amite County for most of her life. Willie is seventy-four years old. It appears that he now lives in McComb, although he previously lived out of state and the record is not clear as to

2

when he moved to Mississippi. Aubrey has lived in California since the early 1960s and is now approximately seventy-five years old. He rarely saw his parents in the last few years of their lives. Margie Mae passed away on May 3, 2012. Charlie passed away on January 9, 2014, at the age of ninety-six. As noted above, this appeal concerns certain bank accounts and CDs that Charlie established prior to his death.

¶5. In 1975, Charlie opened a savings account at First National Bank (now known as Trustmark National Bank) that named Cynthia as a joint owner. At that time, Charlie had moved to Wisconsin for work, and Cynthia was living with relatives in Mississippi while she finished high school. In the 1980s and 1990s, Charlie established additional accounts and CDs that named Cynthia as a joint owner. Charlie provided all of the funds for these accounts and CDs. Cynthia wrote checks on and made deposits to and withdrawals from the accounts, but only at Charlie's direction.

¶6. In 1993, Charlie and Margie Mae moved back to Mississippi and lived less than a mile from Cynthia for the rest of their lives. After he returned to Mississippi, Charlie continued to maintain and create accounts and CDs that named Cynthia as a joint owner. Cynthia saw her parents almost daily, but it is undisputed that Charlie remained independent, active, and competent to manage his own affairs for many years after he returned to Mississippi.

¶7. In April 2010, Charlie executed (1) a durable general power of attorney designating Cynthia as his attorney-in-fact; (2) a deed conveying 140 acres in Amite County to Cynthia; and (3) a will. The will was sealed, and Cynthia and her husband, John, testified that they had not seen it and did not know what it provided. John testified that Charlie made the

3

appointment with the attorney himself. John testified that he drove Charlie to the attorney's office because Charlie asked him to do so; however, he did not attend the appointment with Charlie or ask him why he needed to see a lawyer. Cynthia testified that she did not ask her father to sign the power of attorney, deed, or will. According to Cynthia, Charlie did not tell her about the documents until after he had signed them, and he warned her that her brothers "were going to cause problems."

¶8.     Cynthia testified that by July 2011, Charlie "was not what he used to be" mentally, and she became concerned that Willie would try to convince Charlie to cut timber on his land. She was also worried that Willie would take Charlie to a bank and persuade him to withdraw funds from his accounts. Cynthia testified that she and her family were going to be out of town for several days, so she moved over $204,000 from joint accounts owned by her and Charlie to her personal bank account. She claimed that she did this to prevent Willie or anyone else from taking advantage of her father.

*Petition for Appointment of a Conservator and Temporary Order*

¶9.     On December 20, 2011, Willie filed a petition in the Amite County Chancery Court to appoint a conservator for Charlie's person and estate.[1] Willie alleged that Cynthia should not be appointed conservator because she had exercised undue influence over Charlie. Aubrey joined Willie's petition. Cynthia subsequently filed an answer and cross-petition for appointment of a conservator. Cynthia agreed that a conservator should be appointed for Charlie's person and estate, and she asked the court to appoint her as conservator.

---

[1] The petition also requested appointment of a conservator for Margie Mae, but she passed away in May 2012, prior to a final hearing on the petition.

¶10. On June 7, 2012, the chancellor entered a temporary order appointing Pike County Chancery Clerk Doug Touchstone[2] as conservator for Charlie's estate and Cynthia as conservator over Charlie's person. The order also directed Cynthia to "deliver" all relevant "financial documents"—including all checking accounts, savings accounts, and CDs—to Touchstone within seven days and "enjoined [Cynthia] from disposing of any [CDs] or funds" in any account "that came from Charlie." The chancellor also ordered Cynthia to account for the approximately $204,000 that she had removed from the joint accounts.

¶11. On July 9, 2012, Touchstone filed a motion to compel Cynthia to comply with the court's order to turn over financial documents and return Charlie's money. Cynthia's response stated that she had returned the funds to the joint accounts on June 25, 2012, and that the court-appointed guardian ad litem (GAL) was already in possession of the financial documents. The funds were transferred from the joint accounts to new conservatorship accounts by September 14, 2012.

*The Guardian Ad Litem Report*

¶12. Willie and Aubrey told the GAL[3] that they had not visited with Charlie in 2012 and were reluctant to visit him at Cynthia's home. Their primary concerns were the power of attorney and deed that Charlie signed in April 2010 and the funds that Cynthia transferred to her personal account. Willie and Aubrey did not believe that Charlie had the capacity in

---

[2] The Amite County Chancery Clerk was unable to serve as Charlie's conservator.

[3] The first attorney appointed as Charlie's GAL withdrew because he previously represented Willie in unrelated litigation. The chancellor then appointed Michael Austin as GAL. Austin is the GAL referred to in this opinion.

April 2010 to sign a deed or a power of attorney. The GAL concluded that the deed and transfer of funds "appear[ed] suspect," "at least on their face." However, he also concluded that all three children appeared to be "motivated by genuine concern for their father."

¶13. The GAL met with Cynthia, her husband, and Charlie at Charlie's home, a "small house/apartment" located directly behind Cynthia's home. Cynthia had the apartment built in 2012 so that she could care for her parents. Previously, Cynthia and her husband had cared for her parents by living temporarily in a camper parked next to her parents' home. The GAL found that Charlie's new home was clean, neat, and comfortable.

¶14. The GAL reported that Charlie was well cared for and in fair physical condition, although he was feeble. Charlie knew his birth year, although he was unable to state his age. Charlie seemed to think that he was still at his home in Amite County, rather than at his daughter's residence in Pike County. Charlie also seemed unsure whether he owned or ever had owned any land, and he tried to avoid answering questions about the land.

¶15. The GAL recommended that Cynthia be required to comply with the court's prior order to return the transferred funds, that the court hire a CPA to examine all of Charlie's financial records, that Charlie receive regular visits from a home health agency, and that Willie and Aubrey be allowed to visit their father at his home.

*The Conservatorship Hearing and Order*

¶16. At a hearing on September 11, 2012, all parties and the GAL agreed that Charlie required a conservator for his person and estate and that Cynthia should continue to act as conservator over his person. The only dispute was whether Touchstone or Cynthia should

6

be conservator over Charlie's estate.

¶17.    Cynthia testified about the joint accounts that she held with her father. She stated that she made withdrawals from and deposits to the accounts while her parents lived in Wisconsin based on her father's instructions. She readily acknowledged that the money in the accounts belonged to her father. She stated that she always considered it his money but that he "trusted" her and "wanted [her] to be over [the money]." She further testified: "By him putting it in my name that meant I would make the decisions about what was to be done with the money." She intended to use the money to "take care of [him], whatever his needs" might be. She testified that she did not "know the law on" what would happen to any money that remained after Charlie died.

¶18.    Cynthia testified that around July 2011, she first noticed that her father's mind seemed to be getting weaker—it "was not what it used to be." She became concerned that, in her absence, Willie might convince Charlie to cut timber or transfer money out of his bank accounts. She claimed that she had to go to Arkansas on July 15, 2011 to help her daughter move to do a student internship,[4] so before she left town, she transferred $204,000 from accounts jointly owned by her and Charlie to her personal account.

¶19.    Cynthia admitted that she had not yet provided Touchstone with all relevant financial documents. She also admitted that she had paid her father's sitters from a joint account despite the court's order not to dispose of any of his funds. She testified that she had not

---

[4] Later in the hearing, Cynthia's daughter testified that she had not moved to Little Rock during the summer of 2011. She lived in Little Rock at the time of the hearing, but she testified that she remained in Jackson to pursue a master's degree after she graduated from college in the summer of 2011.

understood the court's order to prohibit such payments.

¶20. The chancellor ruled from the bench that Touchstone would remain as conservator of Charlie's estate and that Cynthia would remain as conservator of Charlie's person. In her bench ruling, the chancellor criticized Cynthia's failure to turn over financial documents and comply with prior court orders. The chancellor also questioned the credibility of some aspects of Cynthia's testimony, noting her daughter's testimony that she had not moved to Arkansas in the summer of 2011. *See supra* n.4.

¶21. The chancellor's subsequent written order directed Cynthia to "deliver" the joint accounts and joint CDs to Touchstone. The order also directed the banks in which the funds were held to "surrender or otherwise turn over" the funds to Touchstone "for transfer and safekeeping in the conservatorship account."

*The 2012 Appeal*

¶22. Cynthia appealed the chancellor's ruling, and her appeal was assigned to this Court. Her appeal did not directly address the transfer or ownership of the funds that had been in the joint accounts and CDs. Rather, she argued that the chancellor erred by not appointing her as conservator of Charlie's estate.

¶23. On January 9, 2014, Charlie passed away. Cynthia and Touchstone then filed a joint motion to dismiss the appeal, stating that Charlie's death had "rendered moot" "all issues" "pending before this Court."[5] This Court granted the motion and dismissed the appeal. *Addison v. Touchstone*, No. 2012-CA-01766-COA (Miss. Ct. App. March 6, 2014).

---

[5] Willie's attorney filed a notice of appearance in the 2012 appeal but did not file a brief or otherwise participate in the appeal.

8

*Order Closing the Conservatorship*

¶24.   After Charlie died, Cynthia and Touchstone filed motions in the chancery court to close the conservatorship.  While those motions were pending, Cynthia filed an amended motion to close the conservatorship in which she requested the return of the funds that had been in the joint accounts and CDs.  During a subsequent in-chambers discussion with the parties, the chancellor apparently permitted or requested additional briefing on issues related to ownership of the funds.

¶25.   After receiving additional briefing from the parties, the chancellor entered a final order adjudicating ownership of the funds, approving the conservator's final accounting, and closing the conservatorship.  The order stated that, prior to the first appeal in this matter,

> [t]he [chancellor] found, based on undisputed testimony, that all of such funds were the property of [Charlie] and directed that the funds be deposited into the Conservatorship accounts . . . .  With such transfer, the funds were confirmed to be the sole property of Charlie . . . .  Cynthia . . . appealed such order but abandoned her appeal after the death of Charlie . . . .

The chancellor ruled that all funds remaining in the conservatorship account should be transferred to Charlie's estate once an administrator was appointed.  Cynthia filed a motion to reconsider, which the chancellor denied, and filed a timely notice of appeal.

**ANALYSIS**

¶26.   The parties' briefs on appeal[6] raise three issues: (1) whether Cynthia's rights in the funds formerly held in the joint accounts and CDs were destroyed when those funds were transferred to new conservatorship accounts and converted into new conservatorship CDs;

---

[6] Touchstone, Willie, and Aubrey are appellees.  Touchstone filed a brief on appeal, and Willie and Aubrey filed a separate brief.

(2) whether Cynthia's survivorship rights to those funds should be disregarded because the joint accounts and CDs were the product of a "confidential relationship" and "undue influence"; and (3) whether Cynthia "abandoned" her claim to the funds when she agreed to dismiss her prior appeal as moot. Before we address these issues, however, we must first address an issue raised by Willie and Aubrey in a motion to dismiss Cynthia's appeal.[7]

## I.    The motion to dismiss the appeal is denied.

¶27.    Willie and Aubrey argue that the appeal should be dismissed because Cynthia appealed from the order denying her motion to reconsider rather than the prior order adjudicating ownership of the funds at issue. This argument is without merit.

¶28.    The chancellor's order adjudicating ownership of the funds and closing the conservatorship was entered in November 2015. Within ten days, Cynthia filed a motion to reconsider. On April 8, 2016, the chancellor denied Cynthia's motion to reconsider. Within thirty days, Cynthia filed a notice of appeal. Cynthia's notice of appeal stated that she was appealing the chancellor's "April 8, 2016 [decision] denying [her] motion to reconsider the Court's order adjudicating ownership, transfer of funds, and closing the conservatorship." Willie and Aubrey argue that by designating the ruling on the motion to reconsider, Cynthia forfeited the right to challenge the underlying ruling adjudicating ownership of the funds and closing the conservatorship. We disagree.

¶29.    To begin with, this Court has clearly and repeatedly held that

---

[7] By prior order of the Court, the motion to dismiss the appeal was denied in part and passed for consideration with the merits in part. *See Jackson v. Addison*, No. 2016-CA-00668-COA (Miss. Ct. App. Sept. 5, 2017).

10

> [a] motion to reconsider filed within ten days of the entry of the judgment falls under Rule 59 and tolls the thirty-day time period to file a notice of appeal until the disposition of the motion. *Consequently, a notice of appeal following the denial of a Rule 59 motion to reconsider encompasses both the denial of reconsideration and the underlying judgment.*

*Woods v. Victory Mktg. LLC*, 111 So. 3d 1234, 1236 (¶7) (Miss. Ct. App. 2013) (emphasis added; citations omitted); *accord, e.g.*, *Denham Law Firm PLLC v. Simmons*, 207 So. 3d 670, 675 (¶17) (Miss. Ct. App. 2017); *Ford v. Miss. Dep't of Human Servs.*, 158 So. 3d 1241, 1244 (¶8) (Miss. Ct. App. 2015).

¶30. Moreover, "[a]n appeal shall not be dismissed for informality of form or title in the notice of appeal." M.R.A.P. 3(c). On this basis, our Supreme Court has held that an appeal from a timely motion to reconsider under Rule 59 is sufficient to permit appellate review of the final judgment that was the subject of the motion to reconsider. *See K.D.F. v. J.L.H.*, 933 So. 2d 971, 974 (¶¶11-12) & n.2 (Miss. 2006). In addition, when the appellant's "'statement of issues and . . . brief clearly show' that a certain order or issue is being appealed, we will consider the merits of the issue." *McNeese v. McNeese*, 119 So. 3d 264, 269 (¶11) (Miss. 2013) (quoting *Fletcher v. Lyles*, 999 So. 2d 1271, 1277 (¶25) (Miss. 2009)).[8] Finally, we note that numerous federal decisions hold that a notice of appeal from an order denying a motion to reconsider under Rule 59 is sufficient to permit review of the underlying judgment,

---

[8] *See also Hamm v. Hall*, 693 So. 2d 906, 912 (Miss. 1997) (holding that although the appellant's "notice of appeal . . . did not expressly refer to [a prior] ruling," the Court had jurisdiction to review the prior ruling because the hearings and order from which the appeal was taken were "merely continuations of that prior . . . order"); *cf. Johnson v. Boydston*, 605 So. 2d 727, 731 (Miss. 1992) (holding that a notice of appeal by an injured party was sufficient to notice an appeal for a spouse's consortium claim when "the issues are identical, and there is no surprise, detrimental reliance, or prejudice, and . . . it is reasonably clear that the omission of the name was an oversight").

at least when the motion to reconsider renewed arguments previously made and generally requested reconsideration of the underlying judgment.[9]

¶31.   This Court clearly has jurisdiction to consider the chancellor's underlying order adjudicating ownership of funds and closing the conservatorship.  Cynthia's notice of appeal mentioned that order, and her brief directly addresses it on the merits.  In addition, Cynthia's timely motion to reconsider merely renewed her prior arguments.  Finally, Willie and Aubrey were in no way misled or prejudiced by the content of Cynthia's notice of appeal.  Their argument that the wording of the notice of appeal limits this Court's jurisdiction is without merit, and their motion to dismiss the appeal is denied.

II.     **Cynthia retained her rights and interest in the funds transferred from joint accounts and CDs to conservatorship accounts and CDs.**

¶32.   Cynthia argues that the funds in the conservatorship accounts and CDs should have reverted to her after Charlie's death because the funds originated in accounts that she and Charlie owned jointly.  Cynthia does not argue that the chancellor erred by ordering those funds to be placed in conservatorship accounts for "safekeeping" during the existence of the conservatorship.  She argues only that the transfers did not destroy her joint ownership of the funds and survivorship rights.  In response, Willie and Aubrey argue that the transfer of the funds terminated the joint tenancy and Cynthia's interest in the funds.  We address these issues below but first provide some additional detail concerning the relevant accounts.

---

[9] *See, e.g.*, *R.P. ex rel. R.P. v. Alamo Heights Indep. Sch. Dist.*, 703 F.3d 801, 808-09 (5th Cir. 2012); *Rojas-Velazquez v. Figueroa-Sancha*, 676 F.3d 206, 209 (1st Cir. 2012); *"R" Best Produce Inc. v. DiSapio*, 540 F.3d 115, 121-22 (2d Cir. 2008); *Artes-Roy v. City of Aspen*, 31 F.3d 958, 961 n.5 (10th Cir. 1994).

¶33. Charlie established the following joint accounts, all of which were designated as jointly owned by or payable to Charlie *or* Cynthia:

- a savings account at First Bank with a balance of $149,811.70 at the time of transfer to the conservatorship;

- a money market account at Trustmark with a balance of $58,763.25 at the time of transfer to the conservatorship;

- certificates of deposit at Trustmark with principal amounts of $5,000, $20,000, and $50,000;

- and a certificate of deposit at First Bank with a principal amount of $78,655.33.

As discussed above, Cynthia transferred funds from the First Bank savings account and the Trustmark money account to her personal accounts in July 2011. She returned the funds to the joint accounts in June 2012, after she was ordered to do so by the chancery court.[10]

¶34. In September 2012, Touchstone created new accounts and CDs to hold these funds, but the new accounts and CDs are all traceable to the former joint accounts. The funds from the joint First Bank savings account were transferred to a new First Bank savings account in Charlie's name, with Touchstone as conservator. A First Bank checking account was also established to make payments for Charlie's care and living expenses.[11] The funds from the

---

[10] Cynthia actually returned $6,670.83 less than she had transferred from the First Bank account and returned $134.29 more than she had transferred from the Trustmark account. The differences in the amounts withdrawn and the amounts returned are not accounted for specifically in the record, although Cynthia did testify generally that she had used her father's funds to pay his sitters and other living expenses he incurred.

[11] During the conservatorship, a total of $25,500 was disbursed to Cynthia for Charlie's care and expenses. In addition, approximately $22,000 in attorney's fees, conservator's fees, and CPA fees was paid from the First Bank savings account or checking account. Touchstone's final accounting showed that the savings account and checking

13

joint Trustmark money market account were transferred to a new Trustmark money market account.[12] The four jointly owned CDs were converted into four new CDs that remained unchanged (except for additions of interest) at the time of the final accounting.

¶35.   As discussed above, the certificates and signature cards for the jointly owned CDs and bank accounts all specifically designated the owners as Charlie "or" Cynthia. In addition, the terms and conditions for the three Trustmark CDs specifically stated that use of the conjunction "or" meant that the CD was payable to either Charlie or Cynthia or to the survivor of them. The First Bank CD similarly provided that it would be owned by Charlie and Cynthia "as joint tenants with rights of survivorship" and could be redeemed by "either of the joint tenants or the survivor."

¶36.   Such provisions are valid and will be enforced under Mississippi law. *See, e.g.*, *In re Estate of Cannon*, 733 So. 2d 245, 250 (¶30) (Miss. 1999); *Cooper v. Crabb*, 587 So. 2d 236, 240 (Miss. 1991); *In re Will & Estate of Strange*, 548 So. 2d 1323, 1327 (Miss. 1989). Moreover, even absent such express statements of survivorship rights, Mississippi law presumes that a jointly owned account or CD payable to any of the joint owners is intended to confer full rights of survivorship on the joint owners. *See* Miss. Code Ann. § 81-5-63 (Rev. 2015); *Madden v. Rhodes*, 626 So. 2d 608, 616 (Miss. 1993); *DeJean v. DeJean*, 982

---

account had a combined balance of approximately $112,000.

[12] The only subsequent withdrawals from this account were to pay approximately $7,400 in GAL fees.

14

So. 2d 443, 449 (¶13) (Miss. Ct. App. 2007).[13]

¶37.    Cynthia's testimony was also consistent with her status as a joint owner of the accounts and CDs. She testified that she considered the money her "father's money," and she intended to use it "to take care of [him], whatever his needs." However, she also testified that her father "wanted her to be over [the money]," i.e., he wanted her to "make the decisions about what was to be done with the money." There was no evidence to rebut her testimony. In addition, her testimony was consistent with the evidence that her father had consistently named her as a joint owner on at least six different accounts or CDs for a period covering more than three decades.

¶38.    Thus, at the time the chancery court appointed a conservator for Charlie's estate, Cynthia was a joint owner of the above-discussed CDs and accounts with her father with rights of survivorship. Therefore, the key issue in this appeal is whether the court-ordered transfer of those funds to conservatorship accounts for "safekeeping" destroyed Cynthia's interest in the funds. For the reasons that follow, we conclude that it did not.

¶39.    Our Supreme Court has held that when a conservator is appointed to protect the assets of a ward who is the joint owner of joint accounts or deposits, "the conservator is not the alter ego of the [ward] and during the life of the [ward] the conservator does not have authority to withdraw all of the account funds unless specific sums are needed for his ward's

---

[13] Mississippi law is also clear that a subsequent will cannot destroy an account or deposit held as a joint tenancy with rights of survivorship. *Estate of Bodman v. Bodman*, 674 So. 2d 1245, 1248 (Miss. 1996). Charlie's will is not part of the record in this appeal. As noted above, Cynthia testified that the will was sealed and that she had not seen it. Willie and Aubrey are contesting the will in a separate proceeding in the chancery court.

necessities." *In re Atkins' Estate*, 422 So. 2d 754, 756 (Miss. 1982). The Supreme Court reasoned that the conservator's authority with respect to a joint account is limited because the ward's right to make a complete withdrawal of all funds from a joint account is a "personal elective right" that may be exercised only at the ward's "personal discretion." *Id.* at 756-57 (quoting *Howard v. Imes*, 90 So. 2d 818, 819-20 (Ala. 1956)); *accord Bodman*, 674 So. 2d at 1250. As another court put it, "[t]he decision regarding distribution of the [ward's] property after death belongs to the [ward]." *In re Estate of Briley*, 825 P.2d 1181, 1184 (Kan. Ct. App. 1992).

¶40. In a subsequent decision, our Supreme Court reiterated "that ownership of a joint tenancy is not necessarily inconsistent with a [conservatorship]." *Bodman*, 674 So. 2d at 1250. Therefore, joint accounts "created prior to the [ward's] incapacity [are] not" "subject to being marshalled by the conservator," although the funds may be used if necessary to pay for the care and expenses of the ward during his lifetime. *Id.*; *see also Conservatorship of Kendrick v. Hancock Bank*, 537 So. 2d 888, 891 (Miss. 1989) ("Any joint assets created by the ward . . . prior to the [time she became incompetent] . . . are presumed valid and the [joint owner] is not required to relinquish her joint interest.").

¶41. Under these precedents, it was appropriate for funds in the joint accounts to be drawn and used for Charlie's care and necessary living expenses during his lifetime. Indeed, Cynthia did not object to such use of the funds and testified that the funds should be used for that purpose alone as long as her father lived. However, as discussed above, most of the funds in the joint accounts and deposits remained unused at the time of Charlie's death. It

16

would not have been proper for the conservator to take any action that would have "had the effect of destroying [Cynthia's] survivorship interest in" those funds. *Atkins*, 422 So. 2d at 756 (quoting *Howard*, 90 So. 2d at 819).

¶42. Nonetheless, Willie and Aubrey now argue that Cynthia's interest in the funds "was destroyed the moment the funds from the joint accounts were withdrawn and placed in the . . . conservatorship accounts." In other words, they contend that the transfer of the funds to new accounts had the immediate, legal effect of destroying all of Cynthia's rights to the funds—regardless of whether those funds were ever needed for Charlie's care and living expenses during his lifetime. We disagree.

¶43. Courts in other states have addressed this issue and have held that a conservator's withdrawal of funds from a joint account does not, in and of itself, destroy the rights of other joint owners. For example, the Kansas Court of Appeals held "that a conservator's withdrawal of funds from a joint account does not have the effect of terminating the rights of a surviving joint owner to those funds." *Briley*, 825 P.2d at 1184. The Michigan Supreme Court similarly held that even though a transfer of funds from a joint account to a conservatorship account "terminated the joint tenancy" in a technical sense, the surviving joint account owner retained his survivorship interest in the transferred funds after the ward's death. *In re Estate of Wright*, 424 N.W.2d 268, 271-72 (Mich. 1988). And the New Hampshire Supreme Court held that a guardian's withdrawal of the entire balance of a joint account did not terminate a surviving joint owner's rights in the account when the withdrawal was not necessary "for the welfare of the ward." *In re Wszolek's Estate*, 295 A.2d 444, 448

17

(N.H. 1972).[14]

¶44. We agree with these courts that a conservator's transfer of funds from a joint account to a conservatorship account does not destroy a joint account owner's survivorship interest in the funds. In this case, the court ordered Touchstone to transfer the funds to "the conservatorship account" for "safekeeping." This transfer for "safekeeping" did not destroy Cynthia's survivorship interest in the funds. Under Mississippi law, the right to make a complete withdrawal of the funds is a purely elective right of the ward that can be exercised only by the ward, not the conservator.

¶45. In summary, Cynthia was a joint owner of the funds at issue when the conservatorship was established, and the formal transfer of the funds from joint accounts to conservatorship accounts did not destroy her survivorship interest in those funds. During Charlie's life, the funds in the joint accounts were properly used to pay for Charlie's necessary care and living expenses; however, Cynthia retained her survivorship interest in the unused funds following Charlie's death.

### III. The joint accounts were not the product of undue influence.

¶46. Willie and Aubrey also make a one-page, in-the-alternative argument that Cynthia's ownership of the joint accounts should be disregarded because she supposedly "failed to rebut with clear and convincing evidence the presumption that the joint accounts were the products of undue influence." They assert that there is a presumption of undue influence

---

[14] We note that the law of these states is consistent with Mississippi law on the subject of a conservator's authority with respect to joint accounts. *See Briley*, 825 P. 2d at 1183-84; *Wright*, 424 N.W.2d at 271; *Wszolek's Estate*, 295 A.2d at 447-48.

18

because "Cynthia . . . clearly had a confidential relationship with Charlie . . . , based on . . . his utter dependency on her to handle his affairs since the age of 16" (i.e., since Cynthia was sixteen years old). This argument is without merit.

¶47. To begin with, Willie and Aubrey presented absolutely no evidence that the joint accounts or CDs were the product of undue influence or that there was a "confidential relationship" between Cynthia and Charlie at the time those accounts and CDs were established.[15] This issue was not even raised in the chancery court.[16] The record shows that the accounts at issue were created between 1975 (when Charlie was only forty-seven years old, and Cynthia was just sixteen) and 1999. There is no evidence that, during this period, Cynthia was "in a position to exercise a dominant influence upon [Charlie] because of [Charlie's] dependency upon her." *Madden*, 626 So. 2d at 617 (discussing "the concept of a confidential fiduciary relationship") (quoting *Hendricks v. James*, 421 So. 2d 1031, 1041 (Miss. 1982)). It is well settled under Mississippi law that a parent/child relationship is not necessarily a confidential relationship, *see, e.g.*, *Noblin v. Burgess*, 54 So. 3d 282, 296 (¶52) (Miss. Ct. App. 2010), and Charlie did not become dependent on Cynthia until years later.

_____

[15] "The [S]upreme [C]ourt has held that the burden of establishing the existence of a confidential relationship is upon the party asserting it. Clear and convincing evidence is necessary to prove the existence of a confidential relationship." *Stevens v. Estate of Smith*, 19 So. 3d 764, 769 (¶12) (Miss. Ct. App. 2009) (citation, quotation marks omitted).

[16] In 2013, the conservator did file a petition to set aside the April 4, 2010 warranty deed, alleging that the deed was the product of a confidential relationship and undue influence. However, that deed was executed thirty-five years after Charlie opened his first joint account with Cynthia, and more than a decade after Charlie created the last of the jointly owned CDs. No further action was taken on the conservator's petition to set aside the deed prior to closing the conservatorship. It appears that Willie and Aubrey may be challenging the deed in a separate proceeding in the chancery court.

Because there was no "confidential relationship" when the joint accounts were created, there was no "presumption of undue influence" for Cynthia to rebut. *See, e.g.*, *Stevens*, 19 So. 3d at 769 (¶12).

¶48.    Cynthia took care of Charlie during his final years, and there is no doubt that a confidential relationship arose at some point as he became increasingly dependent on her. However, Charlie was not incompetent or subject to any "dominant influence" when he created the joint accounts years earlier. Willie and Aubrey's argument is a bare assertion in their appellate brief, unsupported by anything in the record.

### IV.    Cynthia did not abandon her claim to the funds when she dismissed her prior appeal as moot.

¶49.    The chancellor's order adjudicating ownership of the funds also suggested that Cynthia effectively "abandoned" any claim to the funds transferred from the joint accounts to the conservatorship accounts when she dismissed her 2012 appeal. On appeal, Touchstone argues the chancellor's ruling can be affirmed on this basis.[17] However, for the reasons that follow, we disagree that the dismissal of the prior appeal as moot can be viewed as an

---

[17] Willie and Aubrey argue that Cynthia is "procedurally barred" from arguing "for the first time on appeal [that] the chancellor erred in finding that [she] 'abandoned'" her claim to the funds by dismissing her prior appeal. However, this issue arose for the first time in the chancellor's order adjudicating ownership of the funds and closing the conservatorship. As far as we can determine, neither Touchstone nor Willie and Aubrey made this argument in the chancery court, and the chancellor never directed the parties to address the issue. Cynthia did not waive her right to challenge the chancellor's ruling simply because she did not anticipate that the chancellor would deny her claim on a ground that neither the conservator nor Willie and Aubrey had raised.

20

abandonment of this issue.

¶50.    As discussed above, the chancellor's September 13, 2012 order directed Cynthia to "deliver" the joint accounts and CDs to Touchstone and directed Touchstone to transfer the funds to "the conservatorship account" for "safekeeping."   Cynthia's appeal from the September 13 order did not directly challenge the chancellor's directives regarding the transfer of funds to a conservatorship account.  Instead, Cynthia's argument in the 2012 appeal was that the she, rather than Touchstone, should have been appointed as conservator of her father's estate.  Cynthia and Touchstone subsequently agreed to dismiss the appeal as moot after Charlie passed away on January 9, 2014.[18]

¶51.    Cynthia and Touchstone appropriately alerted this Court that the 2012 appeal was moot.  The only question in that appeal was who should serve as Charlie's conservator, and Charlie's death rendered that question moot.  Cynthia did not "abandon" her claim to the funds at issue in this appeal when she agreed that her prior appeal was moot.  She was not required to continue litigating a moot question in order to preserve her claim to the funds at issue in this appeal—a separate issue that was not raised in the 2012 appeal.

¶52.    Furthermore, the chancellor's September 13, 2012 order did not expressly or finally adjudicate or terminate Cynthia's interest in the funds at issue in this appeal.  The chancellor did order that the funds be transferred to conservatorship accounts for "safekeeping" and to pay Charlie's expenses.  However, as discussed above, Mississippi law permits funds held

---

[18] Willie's attorney filed an appearance in the 2012 appeal but did not file a brief.

in joint accounts to be used for a ward's necessary expenses, and Cynthia expressly agreed that the funds should be used only for Charlie's care and expenses as long as he was alive. Therefore, the chancellor's September 13, 2012 order was not necessarily inconsistent with Cynthia's claim to a survivorship interest in any funds that remained unused at Charlie's death. That being the case, the order did not put Cynthia on notice that she was required to continue litigating the 2012 appeal—even after the central question in that appeal became moot—in order to preserve her claim to a survivorship interest in the funds.

## CONCLUSION

¶53. Cynthia was a joint owner with survivorship rights in the joint accounts and CDs that her father established while he was still competent, years before his mental condition declined to the point that he required a conservator or could have been subject to undue influence. The transfer of those funds to a conservatorship account for "safekeeping" did not destroy Cynthia's survivorship interest. Nor did she abandon her claim to the funds when she properly agreed to dismiss her prior appeal as moot. We therefore hold that all funds transferred to the conservatorship accounts or converted into conservatorship CDs must be returned to Cynthia as the surviving owner of the funds.

¶54. **REVERSED AND RENDERED.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, CARLTON, FAIR, GREENLEE, WESTBROOKS AND TINDELL, JJ., CONCUR.**

22