341 Conn. 815　　　FEBRUARY, 2022　　　815

Day *v.* Seblatnigg

MARGARET E. DAY, COCONSERVATOR (ESTATE
OF SUSAN D. ELIA) *v.* RENEE F.
SEBLATNIGG ET AL.
(SC 20280)

Robinson, C. J., and Palmer, McDonald, Mullins,
Kahn, Ecker and Vertefeuille, Js.*

*Syllabus*

Pursuant to statute ((Rev. to 2011) § 45a-655 (a)), "[a] conservator of the
estate appointed under section 45a-646 . . . shall manage all the estate
and . . . shall use the least restrictive means of intervention in the
exercise of the conservator's duties and authority."

Pursuant further to statute ((Rev. to 2011) § 45a-655 (e)), "[u]pon application
of a conservator of the estate . . . the court may authorize the conserva-
tor to make gifts or other transfers of income and principal from the
estate of the conserved person in such amounts and in such form,
outright or in trust, whether to an existing trust or a court-approved
trust created by the conservator, as the court orders . . . ."

The plaintiff, the coconservator of the estate of E, sought a judgment declar-
ing that a certain irrevocable trust was void ab initio and unenforceable,
and that any and all assets transferred from E's estate to the trust be
returned to the estate. The Probate Court previously had granted the
application of E, who suffered from Parkinson's disease, for the volun-
tary appointment of a conservator of her person and her estate pursuant
to the voluntary conservatorship statute ((Rev. to 2011) § 45a-646). The
Probate Court appointed the named defendant, S, as the conservator
of E's estate and issued a decree providing that S had the power to
manage the estate, to apply estate funds to support E, to pay her debts,
and to collect debts due to her. Thereafter, S met with representatives
of the defendant F Co. At their recommendation, S, in her capacity as
conservator of E's estate, entered into an asset protection services
agreement on E's behalf with F Co.'s corporate affiliate and established
a self-settled irrevocable asset protection trust. S supervised E's execu-
tion of the instrument creating the irrevocable trust but did not seek
or obtain the Probate Court's approval. The irrevocable trust named S
as a trustee and F Co. as the protector of the trust. Thereafter, S directed
the transfer of more than $6 million in assets to the irrevocable trust
from E's estate, nearly all of which came from a revocable trust, of
which S was a trustee, that E previously had established. After S resigned
as conservator of E's estate, the Probate Court appointed the plaintiff
to serve as the coconservator of E's estate for the limited purpose of

---

* The listing of justices reflects their seniority status on this court as of
the date of oral argument.

Day *v.* Seblatnigg

any matters relating to E's interest in the irrevocable trust. After the plaintiff commenced the present declaratory judgment action in the trial court, she filed a motion for summary judgment, claiming that there was no genuine issue of material fact as to whether the irrevocable trust was void. The trial court granted the plaintiff's motion, agreeing that the irrevocable trust was void ab initio and unenforceable, and ordered that the transferred assets be returned to E's estate. The court concluded that a conservator retains the exclusive authority to manage a voluntarily conserved person's affairs and rejected F Co.'s argument that § 45a-655 (e) did not apply because E, and not S, had created the irrevocable trust. The court further reasoned that the revocable trust was part of E's estate, subject to the conservator's authority, and, in turn, subject to the requirements of § 45a-655 (e), because E had an equitable interest in the revocable trust, and S had failed to comply with § 45a-655 (e) insofar as she did not obtain the Probate Court's approval prior to the creation or funding of the irrevocable trust. From the judgment rendered in favor of the plaintiff, F Co. appealed to the Appellate Court, claiming, inter alia, that the trial court had incorrectly determined that E lacked authority to execute the irrevocable trust while under a voluntary conservatorship. The Appellate Court affirmed the trial court's judgment, and F Co., on the granting of certification, appealed to this court. *Held* that the Appellate Court properly upheld the trial court's determination that S, as conservator, had exclusive control over E's estate and that E therefore lacked the legal authority to create or to fund the irrevocable trust, rendering the irrevocable trust null and void ab initio: although the language of the relevant statues did not expressly resolve whether a voluntarily conserved person and a conservator share joint authority over the management of the voluntarily conserved person's estate, the text and the history of the statutory scheme governing conservatorships demonstrated that the legislature did not intend to allow a voluntarily conserved person to retain joint control over matters delegated to the conservator's authority, as this court has long construed the language prescribing the conservator's duty to "manage all the estate," as used in § 45a-655 (a), as conferring exclusive control on the conservator; moreover, the various amendments to the conservatorship statutory scheme did not change the conservator's exclusive authority over "all the estate" assigned to him or her by the Probate Court but, rather, indicated a legislative intent that conservatorships be limited in scope, that they not unnecessarily restrict the independence of the conserved person, and that conservators have exclusive control over those affairs assigned to them, subject to the condition that they use the least restrictive means of intervention in the exercise of their assigned duties, and nothing in the statutory scheme suggests that the exclusive nature of the authority conferred on the conservator of the estate differs when the conservatorship is voluntary rather than involuntary in nature; furthermore, under F Co.'s construction of the relevant

341 Conn. 815 FEBRUARY, 2022 817

Day *v.* Seblatnigg

statutory provisions, conservators of voluntarily conserved persons would be placed in an untenable position if the conserved person retained the same legal authority that he or she had before being conserved, because, if the voluntarily conserved person could freely dispose of his or her estate without the knowledge of the conservator, the conservator would be unable to fulfill his or her statutory duty to "manage all the estate," and few would be willing to assume the risk of becoming a conservator pursuant to a voluntary application under such a construction; in addition, although F Co. cited cases for the proposition that a conserved person with the requisite mental capacity may retain the authority to engage in acts that are outside of the sphere of the conservatorship as a matter of law or under the facts of a particular case, F Co. cited no case for the proposition that a conservator and a voluntarily conserved person may exercise concurrent authority over matters assigned to the conservator, and this court's conclusion that a voluntary conservatorship deprives the conserved person of the legal authority to manage his or her own financial affairs was consistent with the decisions of the other jurisdictions that have considered the issue.

(*Five justices concurring separately in one opinion*)

Argued February 20, 2020—officially released January 21, 2022**

*Procedural History*

Action for a judgment declaring, inter alia, a certain trust void ab initio and unenforceable, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk, where the court, *Heller, J.*, granted the plaintiff's motion for summary judgment and rendered judgment thereon, from which the defendant First State Fiduciaries, LLC, appealed to the Appellate Court, *DiPentima, C. J.*, and *Prescott* and *Flynn, Js.*, which affirmed the trial court's judgment, and the defendant First State Fiduciaries, LLC, on the granting of certification, appealed to this court. *Affirmed.*

*James G. Green, Jr.*, with whom was *Laura W. Ray*, for the appellant (defendant First State Fiduciaries, LLC).

*Glenn W. Dowd*, with whom, on the brief, was *Howard Fetner*, for the appellee (substitute plaintiff Marc W. Elia).

** January 21, 2022, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

Day *v.* Seblatnigg

*Opinion*

ROBINSON, C. J. The issue that we must decide in this certified appeal, broadly stated, is whether a person who has voluntarily obtained the appointment of a conservator, and thus has not been found by a court to be incapable of managing her affairs, shares joint authority with the conservator of her estate. This issue arises in the specific context of the question of whether an inter vivos trust created by a person under a voluntary conservatorship was void ab initio because the authority to create such a trust rested exclusively with the conservator of the estate under General Statutes (Rev. to 2011) § 45a-655.[1]

---

[1] General Statutes (Rev. to 2011) § 45a-655 provides in relevant part: "(a) A conservator of the estate appointed under section 45a-646 [voluntary conservatorship], 45a-650 [involuntary conservatorship] or 45a-654 [temporary conservatorship] shall, within two months after the date of the conservator's appointment, make and file in the Court of Probate, an inventory, under penalty of false statement, of the estate of the conserved person, with the properties thereof appraised or caused to be appraised, by such conservator, at fair market value as of the date of the conservator's appointment. Such inventory shall include the value of the conserved person's interest in all property in which the conserved person has a legal or equitable present interest, including, but not limited to, the conserved person's interest in any joint bank accounts or other jointly held property. The conservator shall manage all the estate and apply so much of the net income thereof, and, if necessary, any part of the principal of the property, which is required to support the conserved person and those members of the conserved person's family whom the conserved person has the legal duty to support and to pay the conserved person's debts, and may sue for and collect all debts due the conserved person. The conservator shall use the least restrictive means of intervention in the exercise of the conservator's duties and authority.

* * *

"(e) Upon application of a conservator of the estate . . . the court may authorize the conservator to make gifts or other transfers of income and principal from the estate of the conserved person in such amounts and in such form, outright or in trust, whether to an existing trust or a court-approved trust created by the conservator, as the court orders to or for the benefit of individuals, including the conserved person, and to or for the benefit of charities, trusts or other institutions described in [the relevant provisions of the Internal Revenue Code of the United States]. . . ."

Unless otherwise indicated, all references to § 45a-655 in this opinion are to the 2011 revision of the statute.

Day *v.* Seblatnigg

In 2011, Susan D. Elia submitted an application to the Probate Court for voluntary representation by the named defendant, Renee F. Seblatnigg,[2] as the conservator of her estate. The Probate Court granted the application. Thereafter, Elia created an irrevocable trust and arranged for the transfer of certain assets to it. In 2014, the plaintiff, Margaret E. Day,[3] acting in her capacity as coconservator of Elia's estate for the limited purpose of matters related to the irrevocable trust, brought this action, seeking a judgment declaring that the trust was void ab initio because Seblatnigg, as Elia's conservator, did not create and fund the trust with the approval of the Probate Court pursuant to § 45a-655 (e). Thereafter, the trial court granted the plaintiff's motion for summary judgment and rendered judgment for the plaintiff. The defendant, First State Fiduciaries, LLC,[4] a Delaware limited liability company that was designated as "the protector of the . . . irrevocable trust," appealed from the judgment to the Appellate Court, claiming, among other things, that the trial court had incorrectly determined that Elia could not create an irrevocable trust on her own behalf while she was under a voluntary conservatorship. The Appellate Court affirmed the judgment of the trial court. *Day* v. *Seblatnigg*, 186 Conn. App. 482, 506, 199 A.3d 1103 (2018). This certified

---

[2] The complaint also named the following defendants: Edward E. Pratesi; Harry D. Lewis; Susan D. Elia; Marc W. Elia and Christine E. Elia, as guardians of certain minor children who were beneficiaries of the Susan D. Elia Irrevocable Trust; then Attorney General George Jepsen; and Sarah Wilbur Day, Matthew Lewis Striplin, Samuel Bowden Striplin and Suzanne Palazzi Day, remainder beneficiaries of the Susan D. Elia Irrevocable Trust. The claims against Seblatnigg, Lewis and Pratesi were ultimately withdrawn. The trial court granted motions of default as to Marc W. Elia, Matthew Lewis Striplin, Samuel Bowden Striplin, Sarah Wilbur Day and Suzanne Palazzi Day. See *Day* v. *Seblatnigg*, 186 Conn. App. 482, 485 n.1, 199 A.3d 1103 (2018).

[3] Elia died during the pendency of this appeal, and Marc W. Elia, in his capacity as executor of Elia's estate, was substituted as a plaintiff.

[4] Hereinafter, all references to the defendant in this opinion are to First State Fiduciaries, LLC.

Day *v.* Seblatnigg

appeal followed.[5] We affirm the judgment of the Appellate Court.

The opinion of the Appellate Court sets forth the following facts, as found by the trial court, and procedural history. "In June, 2011, Elia applied to the . . . Probate Court for the voluntary appointment of a conservator of her person and her estate [because she had Parkinson's disease, a progressively degenerative condition].[6] Following a June 28, 2011 hearing in the . . . Probate Court, at which the court, *Hopper, J.*, saw Elia in person, heard her reason for seeking voluntary representation, and explained to her that appointing a con servator as requested would subject her and her property to the authority of the conservator, the court . . .

[5] We granted the defendant's petition for certification to appeal on the following issue: "Did the Appellate Court properly uphold the trial court's conclusion that an irrevocable trust created by a voluntarily conserved person was void ab initio under . . . § 45a-655 (e), regardless of whether the conserved person at the time of the transfer had unimpaired testamentary capacity?" *Day* v. *Seblatnigg*, 331 Conn. 913, 204 A.3d 702 (2019). Neither the fact that Elia may have had unimpaired testamentary capacity nor the application of § 45a-655 (e) is, however, relevant to the issue on appeal, as framed by the parties. Indeed, the issue of Elia's testamentary capacity was not raised in the proceedings below, and the Appellate Court never addressed the application of § 45a-655 (e). Rather, the question that the parties and the courts below have addressed is whether a voluntarily conserved person who has not been found "*incapable of managing . . . her affairs,*" as that phrase is defined in General Statutes (Rev. to 2011) § 45a-644 (d), may create an irrevocable trust. Accordingly, we reframe the certified question as follows: "Did the Appellate Court properly uphold the trial court's conclusion that an irrevocable trust created by a voluntarily conserved person was void ab initio under § 45a-655 (e), regardless of the fact that the conserved person at the time of the transfer has not been found 'incapable of managing . . . her affairs,' as that phrase is defined in General Statutes (Rev. to 2011) § 45a-644 (d)?" See, e.g., *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, 276 Conn. 168, 191–92, 884 A.2d 981 (2005) (court may reframe certified question to more accurately reflect issue presented).

[6] Elia submitted letters to the court from a physician opining that she had a mild cognitive impairment, consistent with her Parkinson's disease, which rendered complex learning or activities requiring concentration, such as balancing a checkbook, difficult, but that she was nonetheless "clearly . . . competent and capable of making her own decisions."

Day *v.* Seblatnigg

granted Elia's application for voluntary representation [by the persons she had designated]. By decree issued on June 28, 2011 . . . the court appointed Seblatnigg the conservator of Elia's estate and Richard DiPaola . . . the conservator of Elia's person.

"The June 28, 2011 decree provided that Seblatnigg, as the conservator of Elia's estate, had the power to manage the estate, to apply estate funds to support Elia, to pay her debts, and to collect debts due to her. At the time of Seblatnigg's appointment as conservator of Elia's estate, Elia owned or held an equitable interest in cash and securities valued in excess of $6,000,000, including those held in the Susan D. Elia Revocable Trust, a 2007 revocable trust governed by Connecticut law (the Connecticut revocable trust). [Seblatnigg was a trustee of that trust.]

"In September, 2011, Seblatnigg consulted with the [defendant's] managers . . . [Attorney] Robert Mauceri . . . and [Attorney] James Holder . . . regarding the creation of an asset protection plan for Elia. They recommended to Seblatnigg that Elia establish and fund a self-settled irrevocable Delaware asset protection trust and a limited liability company, to be owned by the trust, to hold her assets.

"Seblatnigg, [in her capacity] as conservator of Elia's estate, entered into an asset protection services agreement on Elia's behalf with First State Facilitators, LLC . . . an affiliate of [the defendant], on September 15, 2011. Seblatnigg, [in her capacity] as conservator, also signed a legal representation agreement on behalf of Elia with Mauceri. On the same day, Seblatnigg met with Elia and supervised her execution of the instrument that created the [Susan D. Elia Irrevocable Trust (Delaware irrevocable trust)]. The trust instrument named Seblatnigg and Salvatore Mulia . . . as the independent trustees of the Delaware irrevocable trust and named [the

Day *v.* Seblatnigg

defendant] as the protector of the Delaware irrevocable trust. Seblatnigg did not seek or obtain the approval of the . . . Probate Court to establish the Delaware irrevocable trust or to advise Elia to execute the trust instrument.

"A Delaware limited liability company, [Peace at Last, LLC (Peace at Last)] . . . wholly owned by the Delaware irrevocable trust, was formed on September 15, 2011, to hold Elia's assets. Beginning on September 20, 2011, Seblatnigg directed the transfer of more than $6,000,000 in cash and securities from Elia's conservatorship estate and the Connecticut revocable trust to the Delaware irrevocable trust or to Peace at Last.[7] Seblatnigg did not seek or obtain the approval of the . . . Probate Court before she transferred the assets to the [Delaware irrevocable trust] . . . or to Peace at Last.

"Seblatnigg resigned as the conservator of Elia's estate on April 5, 2013. The . . . Probate Court accepted Seblatnigg's resignation on May 21, 2013, subject to the allowance of her final account, and appointed Mulia the successor conservator of Elia's estate. . . .

"On January 9, 2014, at Elia's request, the . . . Probate Court issued a decree . . . naming the plaintiff the coconservator of Elia's estate for the limited purpose of any matters relating to Elia's interest in the Delaware irrevocable trust, because Mulia had a possible conflict of interest." (Footnotes added; internal quotation marks omitted.) *Day* v. *Seblatnigg*, supra, 186 Conn. App. 486–89.

---

[7] The plaintiff executed an affidavit in which she averred that $6,538,415.49 was transferred to the Delaware irrevocable trust from the Connecticut revocable trust and that $80,000 was transferred to the Delaware irrevocable trust from "Seblatnigg's conservatorship account . . . ." Nothing in the record indicates whether any funds remained in the Connecticut revocable trust following the transfer of assets to the Delaware irrevocable trust.

The plaintiff subsequently brought this declaratory judgment action, in which she sought a declaration that the Delaware irrevocable trust was null and void ab initio and an order that "any and all assets transferred to the [Delaware irrevocable trust] or to any entity owned by [that] trust be returned to the conservatorship estate from whence they came . . . ." The plaintiff then filed a motion for summary judgment, claiming that there was no genuine issue of material fact as to whether the Delaware irrevocable trust was void because the assets held in the Connecticut revocable trust were part of the conservatorship estate, and Seblatnigg had not obtained the permission of the Probate Court to create or to fund the Delaware irrevocable trust, which, according to the plaintiff, was required by § 45a-655 (e). The plaintiff further contended that Elia's signature on the trust documents could not invalidate the otherwise improper act because, as a voluntarily conserved person, she lacked independent power to create and fund the Delaware irrevocable trust. The defendant contended that § 45a-655 (e) did not apply because the Connecticut revocable trust, which predated the conservatorship, was not part of the conservatorship estate and because Elia herself, not Seblatnigg, created and funded the Delaware irrevocable trust.

The trial court concluded that, when a person is subject to a voluntary conservatorship, "the conservator, as the agent of the Probate Court, has the *exclusive* authority to manage the affairs of the conserved person." (Emphasis added.) The court further concluded that, because Elia held a present equitable interest in the Connecticut revocable trust, it was part of the conservatorship estate subject to the conservator's authority and, in turn, the requirements of § 45a-655 (e).[8]

_____

[8] The trial court concluded that the preexisting Connecticut revocable trust was part of the conservatorship estate because § 45a-655 (a) requires the conservator to make and file an inventory of the conserved person's estate and provides that such inventory shall include any "equitable" interest in property held by the conserved person. The Appellate Court found it

Day *v.* Seblatnigg

Because Seblatnigg had not complied with the requirement that she obtain Probate Court approval for the creation and funding of trusts on behalf of a conserved person, the court concluded that "the Delaware irrevocable trust [was] void ab initio and unenforceable, and all transfers of assets from Elia's conservatorship estate to the trust or to Peace at Last were unauthorized and improper." Accordingly, the court granted the plaintiff's motion for summary judgment.

The defendant appealed from the trial court's judgment to the Appellate Court, claiming, among other things, that the trial court had incorrectly determined that "Elia lacked the ability to execute the Delaware irrevocable trust while under a voluntary conservatorship."[9] *Day* v. *Seblatnigg*, supra, 186 Conn. App. 501. The Appellate Court concluded that, "[b]ecause a voluntarily conserved person does not retain control over her estate, no genuine issue of material fact existed that Elia lacked the legal capacity to form the Delaware

unnecessary to address this issue; see *Day* v. *Seblatnigg*, supra, 186 Conn. App. 506 n.10; and, for the reasons stated subsequently in this opinion, we also do not address it. See footnote 20 of this opinion.

[9] In its appeal to the Appellate Court, the defendant also contended that there were material issues of material fact in dispute as to whether (1) Seblatnigg or Elia created the Delaware irrevocable trust, and (2) Seblatnigg transferred the funds from the Connecticut revocable trust in her capacity as trustee or conservator. The Appellate Court concluded that the trial court had found that there was no genuine issue of material fact that Elia created the Delaware irrevocable trust (the position advocated by the defendant); see *Day* v. *Seblatnigg*, supra, 186 Conn. App. 501 and n.9; and that Seblatnigg's status as transferor did not constitute a genuine issue of material fact that precluded summary judgment because Elia lacked "legal capacity" to create the trust. Id., 505; see id., 506 n.10. On appeal to this court, the defendant maintains its position that Elia created the trust, and we assume that to be the case for purposes of this opinion. In addition, the defendant contended that the Connecticut revocable trust assets, as assets legally titled to trustees of a preexisting trust, were not part of the conservatorship estate and, thus, not subject to § 45a-655 (e). See id., 506 n.10. The Appellate Court concluded, for reasons set forth later in this opinion, that it was unnecessary to address this claim. Id.

Day *v.* Seblatnigg

irrevocable trust'' and, therefore, that the trial court correctly determined that the Delaware irrevocable trust was void ab initio as a matter of law. Id., 505–506. Accordingly, the Appellate Court affirmed the judgment of the trial court. Id., 506.

This certified appeal followed. The defendant contends that the Appellate Court incorrectly determined that Elia lacked the ''legal capacity'' to create the Delaware irrevocable trust because Seblatnigg, as the conservator of her estate, had exclusive control over her estate. We disagree.

We begin by setting forth the applicable standard of review. ''The standards governing our review of a trial court's decision to grant a motion for summary judgment are well established. Practice Book [§ 17-49] provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party seeking summary judgment has the burden of showing the absence of any genuine issue [of] material facts [that], under applicable principles of substantive law, entitle him to a judgment as a matter of law . . . and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact. . . . A material fact . . . [is] a fact [that] will make a difference in the result of the case. . . . Finally, the scope of our review of the trial court's decision to grant the plaintiff's motion for summary judgment is plenary.'' (Internal quotation marks omitted.) *DiPietro* v. *Farmington Sports Arena, LLC*, 306 Conn. 107, 115–16, 49 A.3d 951 (2012).

A question of statutory interpretation is presented by the defendant's contention that the Appellate Court incorrectly determined that, under the statutory scheme, conservators have exclusive control over the estates of conserved persons and, therefore, that conserved persons lack the capacity to create and fund trusts on their own behalf. As such, our review is plenary. See, e.g., *Jobe* v. *Commissioner of Correction*, 334 Conn. 636, 647–48, 224 A.3d 147 (2020). "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Internal quotation marks omitted.) Id., 648.

We begin with a review of the relevant statutes. General Statutes (Rev. to 2011) § 45a-644 (a), which applies to voluntary and involuntary representation, defines "conservator of the estate" in relevant part as "a person . . . appointed by the Court of Probate . . . to supervise the [respondent's] financial affairs . . . ." Whereas an involuntary conservatorship may not be ordered in the absence of a finding that the respondent is incapable of managing her affairs; see General Statutes (Rev. to 2011) § 45a-650 (f) (1); when the Probate Court grants an application for voluntary representation, the Probate Court "shall not make a finding that the petitioner is

Day *v.* Seblatnigg

incapable.''[10] General Statutes (Rev. to 2011) § 45a-646. Presumably because of this distinction, a "conserved person" is defined as "a person for whom *involuntary* representation is granted . . . .'' (Emphasis added.) General Statutes (Rev. to 2011) § 45a-644 (h). Despite the lack of a finding of incapacity for voluntary representation, a conservator appointed under such circumstances "shall have all the powers and duties of a conservator of the . . . estate of an incapable person . . . .'' General Statutes (Rev. to 2011) § 45a-646. Those powers and duties are set forth in § 45a-655, which provides in relevant part that a conservator of the estate "shall manage all the estate" of the conserved person but "shall use the least restrictive means of intervention in the exercise of the conservator's duties and authority.'' General Statutes (Rev. to 2011) § 45a-655 (a).

The defendant contends that, because Elia was not a "conserved person," as defined by General Statutes (Rev. to 2011) § § 45a-644 (h), and, because the Probate Court made no finding and, indeed, was statutorily prohibited from making a finding, that she was incapable, she retained the capacity to create the Delaware irrevocable trust. In support of the proposition that Elia's capacity to create the trust presents a question of fact, the defendant points to case law recognizing that even involuntarily conserved persons may have the requisite mental capacity to undertake certain acts. It further

___

[10] General States (Rev. to 2011) § 45a-644 (d) provides: " 'Incapable of managing his or her affairs' means that a person has a mental, emotional or physical condition that results in such person being unable to receive and evaluate information or make or communicate decisions to such an extent that the person is unable, even with appropriate assistance, to perform the functions inherent in managing his or her affairs, and the person has property that will be wasted or dissipated unless adequate property management is provided, or that funds are needed for the support, care or welfare of the person or those entitled to be supported by the person and that the person is unable to take the necessary steps to obtain or provide funds needed for the support, care or welfare of the person or those entitled to be supported by the person.''

Day *v.* Seblatnigg

contends that this conclusion is compelled by the statutory requirement that the conservator "supervise" financial affairs; General Statutes (Rev. to 2011) § 45a-644 (a); through the "use [of] the least restrictive means of intervention . . . ." General Statutes (Rev. to 2011) § 45a-655 (a). The defendant argues that interpreting the conservator's authority over "all the estate" to mean exclusive control, rather than as merely a description of the scope of the estate over which concurrent control exists, would be inconsistent with this restriction. Finally, the defendant contends that, because Elia had the right to establish the trust and the provision of § 45a-655 (e) requiring the permission of the Probate Court to establish a trust for a conserved person applies only to the conservator, the statute simply does not apply in the present case.

We conclude that, although the statutory language does not expressly resolve this question, there is a wealth of evidence that the legislature did not intend to allow a person who has voluntarily sought a conservator to retain joint control over the matters delegated to the conservator's authority.

It is useful at the outset to clarify certain terminology. The Appellate Court framed the question as whether Elia had the "legal capacity" to create the Delaware irrevocable trust. *Day* v. *Seblatnigg*, supra, 186 Conn. App. 505. We find the term "legal capacity" inappropriate and misleading as applied to the case at hand because it implies that we are inquiring into Elia's *mental* capacity. See *Luster* v. *Luster*, 128 Conn. App. 259, 271–72, 17 A.3d 1068, cert. granted, 302 Conn. 904, 23 A.3d 1243 (2011) (appeal dismissed April 12, 2012); see also E. Flynn & A. Arstein-Kerslake, "The Support Model of Legal Capacity: Fact, Fiction, or Fantasy?," 32 Berkeley J. International L. 124, 127 (2014) (some degree of actual or presumed mental incapacity typically is predicate to legislative or legal determination

Day *v.* Seblatnigg

of lack of legal capacity). A person who is voluntarily represented by a conservator, however, has not been found to be incapable of managing her affairs. We therefore frame the issue as one of Elia's "legal authority." We also note that the term "conserved person" is statutorily defined to mean persons subject to involuntary conservatorships. See General Statutes (Rev. to 2011) § 45a-644 (h). Nevertheless, because the statutes describing the rights and duties in relation to a "conserved person" also apply to voluntary conservatorships; see General Statutes (Rev. to 2011) §§ 45a-646 and 45a-655; we use the term "voluntarily conserved person" to refer to persons who are subject to a voluntary conservatorship.

Having clarified the terminology, we turn to the evidence demonstrating that the legislature did not intend for voluntarily conserved persons to have joint authority with their conservators over the management of their estates. The language prescribing the conservator's duty to "manage all the estate"; General Statutes (Rev. to 2011) § 45a-655 (a); has been part of the conservator statute for more than one century. In 1899, this court explained that this language confers exclusive control on the conservator: "[T]he conservator has as against the ward, the sole care and management of the estate and the sole power over the claims in favor of or against the estate. He alone can collect, by suit or otherwise, debts due to the ward, and he alone can pay the debts due from the ward. As under the law the ward may be thus deprived of substantially all power over his estate . . . ." *Johnson's Appeal from Probate*, 71 Conn. 590, 597, 42 A. 662 (1899); accord *Marshall* v. *Kleinman*, 186 Conn. 67, 69, 438 A.2d 1199 (1982); *State* v. *Tarcha*, 3 Conn. Cir. 43, 45, 207 A.2d 72 (1964).

When the legislature created the concept of voluntary representation by conservators in 1977, it deemed the persons appointed thereunder to have "all the powers

and duties'' of the conservator of the estate of an incapable person, with no limitation on the scope of those powers. See Public Acts 1977, No. 77-446, § 5, codified at General Statutes (Rev. to 1977) § 45a-646. This like treatment may have rested on the legislature's intention to allow people who in fact would meet the statutory definition of incapacity under the conservatorship scheme to voluntarily submit to a conservatorship. The legislative history reveals that the voluntary conservatorship was proposed in part to allow such persons to obtain help managing their affairs without having to admit to their incapacity, even if they then met the statutory definition of incapacity. See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 1, 1977 Sess., pp. 189–90, testimony of Probate Judge Bernard F. Joy (chairman of committee appointed by Probate Court administrator to provide proposal to amend conservatorship scheme). A 1987 amendment to § 45a-646 ensured that, for those persons whose impairments did not quite rise to the level of the statutory definition of incapacity at the time the voluntary conservatorship was ordered, subsequent incapacity would not revoke the voluntary conservatorship. See Public Acts 1987, No. 87-87.

In 1998, the legislature adopted a provision that permitted the Probate Court to limit the powers and duties of the conservator, in light of the conserved person's abilities and other support services available to the conserved person. See Public Acts 1998, No. 98-219, § 17, codified at General Statutes (Rev. to 1999) § 45a-650 (g). Thus, "[p]rior to 1998, in all cases in which a court found that a respondent was incapable, it was obligatory to appoint a plenary conservator. While [the 1998] amendments . . . permitted appointment of a conservator on a limited basis . . . plenary appointments continued to be the norm.'' (Internal quotation

Day *v.* Seblatnigg

marks omitted.) *Kortner* v. *Martise*, 312 Conn. 1, 53, 91 A.3d 412 (2014).

In 2007, the legislature undertook a substantial revision of the conservatorship scheme, aimed at protecting the rights and preserving the dignity of persons who were subject to involuntary conservatorships. See Public Acts 2007, No. 07-116; see generally 50 S. Proc., Pt. 10, 2007 Sess., pp. 3228–39. The 2007 act made no changes to court procedures for ordering voluntary conservatorships, which, unlike involuntary conservatorships, always have been subject to termination upon request. See General Statutes § 45a-647. For involuntary conservatorship proceedings, the trial court could assign to the conservator only those duties and authorities that are the "least restrictive means of intervention"[11] necessary to meet the needs of the conserved person; General Statutes (Rev. to 2011) § 45a-650 (*l*); and the involuntarily conserved person would retain "all rights and authority not expressly assigned . . . ." General Statutes (Rev. to 2011) § 45a-650 (k). Both the text and the legislative history of the 2007 act indicate that "the legislature intended . . . for a conservatorship to be *as limited in scope as possible*, [as well as for] the conservatorship [to] be carried out so as to maintain the most independence and self-determination for the conserved person."[12] (Emphasis added.) *Kortner* v.

[11] " 'Least restrictive means of intervention' means intervention for a conserved person that is sufficient to provide, within the resources available to the conserved person either from the conserved person's own estate or from private or public assistance, for a conserved person's personal needs or property management while affording the conserved person the greatest amount of independence and self-determination." General Statutes (Rev. to 2011) § 45a-644 (k).

[12] See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 17, 2007 Sess., pp. 5415–16, testimony of James D. McGaughey, executive director of the Office of Protection and Advocacy for Persons with Disabilities (explaining that, under existing scheme, his "office frequently encounter[ed] people who either could have benefited from some very limited, narrowly tailored form of conservatorship, but instead got a full conservatorship and lost all their rights"); id., p. 5443, testimony of Judith Desautell (arguing that

Day *v.* Seblatnigg

*Martise*, supra, 312 Conn. 52; see also K. McEvoy, "Recent Developments in Connecticut Conservatorship Law," 81 Conn. B.J. 319, 319 (2007) ("[t]he most fundamental aspect of the [changes made in the 2007 public act] is that they build on prior Connecticut law to require a presumption of limited, rather than plenary, conservatorship").

The 2007 amendments reflected the view that involuntarily conserved persons could be incapable of managing some of their affairs, while retaining the capacity to manage others, and, as to those matters for which they retained such capacity, they would have exclusive authority and would not share joint control with the conservator. With respect to those affairs that are under the control of the conservator, the conservator would have exclusive control, subject to the condition that the conservator must use the least restrictive means of intervention in the *exercise* of those duties assigned to them. See General Statutes (Rev. to 2011) § 45a-655 (a). Thus, the revised scheme did not change the conservator's exclusive authority over "all the estate" assigned to him or her.

Nothing in the statutes suggests that the exclusive nature of the authority conferred on the conservator of the estate with respect to the matters over which the conservator has control differs when there is a voluntary conservatorship. There was in fact no need for the legislature to create a mechanism that would allow persons to voluntarily obtain assistance with the management of their affairs without ceding their authority. Persons seeking a relationship of joint authority

proposed bill would address problems she encountered when involuntarily conserved because "the court could have imposed a limited conservator[-ship]"); id., p. 5462, testimony of Judge Robert Killian (explaining changes proposed in bill as part of committee he chaired, including requiring conservators "to provide assistance only in the limited areas where someone [cannot] function for themselves").

Day *v.* Seblatnigg

could execute a power of attorney; see General Statutes
(Rev. to 1977) §§ 1-42 through § 1-56; and concerns
about future incapacity could be addressed through the
prophylactic designation of a conservator.[13] See General
Statutes § 45a-645.

There also are practical reasons why the legislature
would not have intended to allow for joint authority in
a conservatorship. A conservator could not fulfill his
or her statutory duty to "manage all the estate" pursuant
to § 45a-655 (a) if the conserved person retained the
same legal authority that the person had before being
conserved, including the ability, for example, to give
the entire estate away without the conservator's knowl-
edge. As one authority has observed, although the statu-
tory scheme governing conservatorships in this state
does not clearly indicate the extent to which persons
subject to voluntary conservatorships retain the "legal
capacity" to manage their affairs, "[r]etention of legal
capacities [to enter into contracts and convey title, for
example] would appear inconsistent with the purposes
of voluntary representation." R. Folsom et al., Con-
necticut Estates Practice Series: Incapacity, Powers of
Attorney and Adoption in Connecticut (4th Ed. 2021)
§ 2:8, p. 131. One of those purposes was, as we have

_____

[13] In the underlying conservatorship proceedings in the present case, the
Probate Court, *Hopper, J.*, informed Elia that the conservator of her estate
"would have management control . . . that [is] very similar to a power of
attorney. The only difference is that a power of attorney doesn't have Probate
Court oversight . . . ." A power of attorney creates a principal-agent rela-
tionship, the person granting that control being the principal. See, e.g.,
*Geriatrics, Inc.* v. *McGee*, 332 Conn. 1, 13–14, 208 A.3d 1197 (2019); *Long*
v. *Schull*, 184 Conn. 252, 256, 439 A.2d 975 (1981). Although the conservator's
obligation to use the least restrictive means of intervention requires the
conservator to ascertain the wishes of the conserved person and to adhere
to them if reasonable, and a voluntarily conserved person may terminate
the conservatorship at will, a voluntary conservatorship does not create the
same relationship as a power of attorney. No claim is made in the present
appeal that Elia retained joint control as a consequence of the court's
statement.

Day *v.* Seblatnigg

explained, to allow persons who might, in fact, meet the statutory definition of incapacity to obtain help in managing their affairs without having to establish their incapacity in an involuntary conservatorship proceeding. If voluntarily conserved persons had the legal authority to manage all of their affairs, persons who are, in fact, incapable would have no choice but to submit to an involuntary conservatorship.

The defendant's construction also would place the conservator in an untenable position. A voluntary conservator may be required to post a bond; General Statutes § 45a-646; and is required to make and file in the Probate Court, under penalty of false statement, an inventory of the conserved person's estate. General Statutes (Rev. to 2011) § 45a-655 (a). Presumably, the purpose of these requirements is to hold the conservator accountable for distributions from the estate. If the voluntarily conserved person could freely dispose of the estate without the knowledge of the conservator, perhaps without making any record or after having become incapable, few would be willing to take on the risk of becoming a conservator pursuant to a voluntary application. Although the defendant emphasizes the fact that Elia and Seblatnigg were acting together and in full agreement when the acts at issue were undertaken, that will not necessarily always be the case.

The defendant suggests that it would be anomalous to conclude that an involuntarily conserved person, who necessarily has been found incapable of managing his or her own affairs; see General Statutes (Rev. to 2011) § 45a-650 (f) (1); might retain rights that a capable voluntarily conserved person does not. We reach no such conclusion in the present case. The sole issue before us is whether a voluntarily conserved person and her conservator may exercise concurrent control over matters delegated to the conservator. Nothing in this opinion suggests that an involuntarily conserved person may

341 Conn. 815　　　FEBRUARY, 2022　　　835

Day *v.* Seblatnigg

exercise such concurrent control. As we previously explained, the Probate Court's mandate in involuntary conservatorship proceedings to "assign . . . only the duties and authority that are the least restrictive means of intervention necessary to meet the needs of the conserved person"; General Statutes (Rev. to 2011) § 45a-650 (*l*); means that the conserved person may retain exclusive authority over matters that he or she is capable of handling, with or without support of individuals other than a conservator. Whether a person applying for a voluntary conservatorship may achieve the same end by requesting the assistance of a conservator for limited matters is not before us.[14]

The defendant also cites several appellate cases that recognize the capacities of even involuntary conserved persons to undertake certain acts, but none of these demonstrates that a conservator and a voluntarily conserved person may exercise concurrent authority over matters assigned to the conservator. These cases stand for an entirely different proposition: a conserved person with the requisite mental capacity may retain the authority to engage in acts that are outside of the sphere of conservatorship as a matter of law or under the facts of the particular case.[15] See *Kortner* v. *Martise*, supra,

---

[14] We observe that, although the voluntary conservatorship statute, § 45a-646, does not include the same express limitation on the court's authority in General Statutes (Rev. to 2011) § 45a-650, it does provide that the voluntarily appointed conservator shall have the "all the powers and duties" of a conservator appointed under General Statutes (Rev. to 2011) § 45a-650. We also note that the standard Probate Court form for an application for voluntary representation provides a section for the applicant to list the duties and authorities of the conservator. See Petition/Voluntary Representation by Conservator, Connecticut Probate Court Form PC-301, available at https://www.ctprobate.gov/Forms/PC-301.pdf (last visited January 20, 2022). There is no claim or evidence in the present case that Elia sought to limit the scope of the voluntary conservatorship in any manner.

[15] The defendant also points to a Superior Court case stating: "Unless a person has been adjudicated incompetent she retains the legal capacity to maintain an action. *Ridgeway* v. *Ridgeway*, 180 Conn. 533, 539 [429 A.2d 801] (1980)." *Reale* v. *Reale*, Superior Court, judicial district of Tolland, Docket No. FA-99-70340-S (January 12, 2000) (26 Conn. L. Rptr. 311, 311).

Day *v.* Seblatnigg

312 Conn. 4–5, 58 (appointment of mother as conserva-
tor of her daughter's person did not deprive conserved
person of capacity to consent to sadomasochistic sex-
ual relationship as matter of law when conservator "did
not establish, or even allege, that her appointment as
conservator . . . specifically included the duty to
manage [the conserved person's] interpersonal and/or
romantic relationships");[16] *Bassford* v. *Bassford*, 180
Conn. App. 331, 335, 347, 352, 183 A.3d 680 (2018)
(adopting trial court decision concluding that involun-
tarily conserved person properly could revoke trust
and thereby receive title to real property held in trust
because evidence demonstrated that conserved person
had requisite mental capacity and right to revoke trust
had not been expressly assigned to conservator).

To the extent that the defendant now contends that
Elia's creation of the Delaware irrevocable trust was a
testamentary act and that, even if she generally lacked
the legal authority to manage her affairs as the result
of the voluntary conservatorship, she retained her testa-
mentary capacity,[17] we conclude that any such claim is

---

The right of access to the courts is not at issue in the present case. *Ridgeway*
provides little, if any, guidance on the question before us.

[16] Our holding in *Kortner* does not suggest that, if such a duty had been
conferred, the conservator would have been able to give her consent to
the man seeking the sexual relationship with her daughter. Rather, the
conservator would have been able to grant her daughter permission to
engage in that relationship if her daughter so chose. See *Kortner* v. *Martise*,
supra, 312 Conn. 58; cf. General Statutes § 46b-29 (a) (requiring written
consent of conservator for marriage license to issue to applicant under
control of conservator). Certain rights are so personal in nature that they
cannot be exercised by another.

[17] The defendant points out that, in *Reid* v. *Lord*, 102 Conn. 365, 368, 128
A. 521 (1925), this court held that the fact that a person was subject to a
conservatorship at the time of death was not conclusive of the person's
mental capacity to execute a will. As the court in *Citizens State Bank &
Trust Co. of Hiawatha* v. *Nolte*, 226 Kan. 443, 601 P.2d 1110 (1979), recog-
nized, although voluntarily conserved persons lack the legal authority to
manage their own financial affairs, they may make testamentary dispositions
if they have testamentary capacity. See id., 450; see also *Bassford* v. *Bassford*,
supra, 180 Conn. App. 349 ("a person may have the mental capacity necessary

Day *v.* Seblatnigg

unreviewable because it is being raised for the first time in this certified appeal; see, e.g., *Mangiafico* v. *Farmington*, 331 Conn. 404, 436, 204 A.3d 1138 (2019); *State* v. *Darryl W.*, 303 Conn. 353, 371, 33 A.3d 239 (2012); and, in any event, is inadequately briefed.[18] See, e.g., *Estate of Rock* v. *University of Connecticut*, 323 Conn. 26, 33, 144 A.3d 420 (2016).

Finally, we observe that several other jurisdictions also have concluded that a voluntary conservatorship of the estate deprives the conserved person of the legal

to make a will although incapable of transacting business generally"); *Kunz* v. *Sylvain*, 159 Conn. App. 730, 741, 123 A.3d 1267 (2015) ("less mental capacity is required for the testator to make a will than to carry on business transactions generally" (internal quotation marks omitted)). We further note that other courts have held that a conservator cannot be given legal authority to make testamentary dispositions for the conserved person both because such rights are purely personal and because the conservator's authority extends only to the lifetime interests of the conserved person. See *Citizens State Bank & Trust Co. of Hiawatha* v. *Nolte*, supra, 449; *In re Estate of Briley*, 16 Kan. App. 2d 546, 549, 825 P.2d 1181 (1992).

[18] The defendant did not address Elia's capacity, testamentary or otherwise, in any of its filings in the trial court in opposition to the motion for summary judgment, focusing instead on the question of whether the Connecticut revocable trust was part of the conservatorship estate. In its briefs submitted to the Appellate Court, the defendant cast this issue as whether Elia retained the capacity to contract and cited no cases relating to testamentary capacity. Because the right to contract is not personal and can be delegated to the conservator, the defendant's Appellate Court brief focused on the question of concurrent authority. We also note that, in its brief to this court, the defendant does not provide any authority to support its assumption that the creation of the Delaware irrevocable trust—which was an inter vivos trust that permitted distributions both during Elia's lifetime, to her and others, and upon her death—was a testamentary act. As the concurring justice notes, there is authority to the contrary. See part I of the concurring opinion; see also *Cate-Schweyen* v. *Cate*, 303 Mont. 232, 239–40, 15 P.3d 467 (2000) (discussing views expressed in § 26 of Restatement (Second) of Trusts and §§ 33 and 88 of Am. Jur. 2d, Trusts). We note that the dual aspects of the trust instrument in the present case, allowing for present and future distributions, raises an interesting question as to whether the execution of such an instrument might require action by both the conservator and the conserved person, not as an act of concurrent authority but jointly taken independent authority. We express no opinion on this question.

Day *v.* Seblatnigg

authority to manage his or her own financial affairs.[19] The decision of the Supreme Court of Kansas in *Citizens State Bank & Trust Co. of Hiawatha* v. *Nolte*, 226 Kan. 443, 601 P.2d 1110 (1979), is particularly instructive. After concluding that "a conservatee under a voluntary conservatorship cannot contract or deed away his property [i]nter vivos without the prior approval of the conservator or, where required by statute, the approval of [a probate] court"; id., 450; the court stated that a contrary rule "would defeat the primary purpose of the voluntary conservatorship statute to dignify old age by eliminating, in many instances, the stigma of having the elderly person declared incapacitated or incompetent. Incapacity is a matter of degree. . . . If a voluntary conservatee, not mentally incapacitated, were to be given an unbridled power to contract or deed away his property [i]nter vivos, the voluntary conservatorship would seldom be used, because the relatives of the elderly person, seeking to protect the loved one from his or her own actions, would of necessity, utilize the compulsory conservatorship procedure. Hence, the [elderly] would in most instances be required to spend their golden years branded as 'incapacitated' or 'incompetent.'

"It also appears . . . that, if a voluntary conservatee were given the power in his discretion to dispose of his property [i]nter vivos, it is doubtful that any person would want to accept the position of conservator, since such a conservator, although given responsibilities and duties, would really have no control over the estate of

---

[19] We note that a contrary conclusion was reached in *Board of Regents State Universities* v. *Davis*, 14 Cal. 3d 33, 41, 533 P.2d 1047, 120 Cal. Rptr. 407 (1975), but that court relied heavily on a statutory provision that implicitly recognized that a conserved person retains power to contract, subject to the conservator's right to disaffirm unreasonable contracts other than those involving the purchase of necessaries that cannot be disaffirmed. Notably, the statute also provided a mechanism for the conservator to petition the court when any doubt as to the propriety of the debt existed. See id.

Day *v.* Seblatnigg

his conservatee. This would be an extremely difficult, if not an impossible situation. . . . [S]uch a holding would create a judicial exception, diminishing the broad powers of a conservator to control and manage the conservatorship assets provided for under the Kansas statutes. The Kansas legislature has not specifically granted a voluntary conservatee the power to contract or to incur debts while the conservatorship is in existence . . . . If the legislature desires to make such an exception, it may do so.

"[The Kansas court] also concluded that there [was] no need for [it to adopt] such a rule. . . . [U]nder [the Kansas statutes], a voluntary conservatorship may be terminated by the mere filing of a verified application by the conservatee that he or she no longer desires to have the conservatorship continued. If the voluntary conservatee really wants to convey his property and is opposed by an uncooperative conservator, the conservatee may go to court and have the voluntary conservatorship terminated. Furthermore, an elderly person, who does not like the [interpretation adopted by the Kansas court], may execute an appropriate power of attorney so that he may have assistance in the management of his affairs without eliminating his power to dispose of his property [i]nter vivos.'' Id., 450–51.

Similarly, the Wisconsin Court of Appeals has held that, "[a]lthough the appointment of a conservator is not evidence of the incompetency of the conservatee, and although a conservatee is not considered completely incapable of looking after his or her own property . . . the purpose of a conservatorship is to afford the protections akin to those provided by a guardianship but without the stigma of incompetency. . . . If a conservatee does not require the input and approval of the conservator or the conservatorship court in matters relating to the disposition of his or her property, a conservatorship serves no meaningful purpose.

Day *v.* Seblatnigg

"If a conservatee wishes to rid himself or herself of the restrictions of a conservatorship, the statute [allowing the conserved person to apply for termination of the conservatorship] supplies an avenue for relief. . . .

"[The Wisconsin court] acknowledge[d] that invalidating [the conservatee's] gift is a harsh result . . . [when] she has been found to be competent at the time of the gift. However . . . to hold that a conservatee may act at his or her whim without conservator or conservatorship court approval would emasculate the statute and render it meaningless. Such interpretations are to be avoided." (Citations omitted.) *Zobel ex rel. Hancox* v. *Fenendael*, 127 Wis. 2d 382, 395–96, 379 N.W.2d 887 (App. 1985), review denied, 128 Wis. 2d 566, 386 N.W.2d 500, appeal dismissed and cert. denied, 479 U.S. 804, 107 S. Ct. 47, 93 L.Ed.2d 9 (1986); see *Bryan* v. *Century National Bank*, 498 So. 2d 868, 872 (Fla. 1986) (competent person subject to voluntary guardianship "may not freely deal with that property which has been placed in the guardian's control in the absence of court approval"); *Foss* v. *Twenty-Five Associates of Roxbury*, 239 Mass. 295, 297–98, 131 N.E. 798 (1921) (competent conserved person who petitioned for conservatorship did not have legal authority to manage own affairs); *Normandin* v. *Kimball*, 92 N.H 62, 64, 25 A.2d 39 (1942) (person who "placed her property in the hands of a conservator . . . could not make a valid contract disposing of that property in her lifetime without his approval" (citation omitted)); *In re Tillman*, 137 N.E.2d 172, 175 (Ohio Prob. 1956) (competent person who consented to appointment of guardian of estate "waived her constitutional rights to control the disposition of her own property and consented to having her property administered by a guardian who was subject to rules of law and the supervision of the [P]robate [C]ourt").

Day *v.* Seblatnigg

We are in full accord with these authorities. We conclude that a person who is subject to a voluntary conservatorship pursuant to § 45a-646 does not retain the legal authority to jointly manage his or her estate as to those matters assigned to the conservator. Rather, the conservator has exclusive control over such matters, subject to any statutory restrictions or requirements. Therefore, insofar as the defendant relies on the concept of concurrent authority, the Appellate Court correctly determined that Elia lacked the legal authority to establish the Delaware irrevocable trust and, accordingly, that the trust was null and void ab initio.[20]

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

MCDONALD, J., with whom PALMER, MULLINS, KAHN and ECKER, Js., join, concurring. I agree with and join the majority opinion but write separately to address two concerns. First, the unusual posture of this case as it ultimately was presented to this court required resolution of a narrow question that leaves several significant questions unanswered regarding the intersection of trusts and conservatorships. This is unfortunate,

[20] As we previously have indicated, the irrevocable trust at issue in the present case was funded largely from a transfer of money from a preexisting revocable trust and, to a lesser extent, from conservatorship estate accounts. The defendant contended throughout the proceedings below that Seblatnigg, as conservator of the estate, had no authority over the assets in the Connecticut revocable trust because, in the defendant's view, trusts created prior to a conservatorship are not part of the conservatorship estate. The Appellate Court concluded that it was not required to reach this claim because, even if Seblatnigg had no control over the revocable trust and thus lacked authority to *transfer* funds from that trust into the Delaware irrevocable trust, Elia lacked the legal capacity to *create* the irrevocable trust. See *Day* v. *Seblatnigg*, supra, 186 Conn. App. 506 n.10. Because we did not grant certification on the question of whether a voluntarily conserved person has the legal authority to create a trust using funds from a preconservatorship trust and the defendant has inadequately briefed the issue, we decline to address it.

Day *v.* Seblatnigg

and I take this opportunity to explain why these questions, had they been properly presented in this case, might have compelled a different outcome than the one the majority reaches today. Second, this case reveals the need for legislative review of voluntary conservatorships, which were not a focus of the 2007 legislative reforms. See Public Acts 2007, No. 07-116. I therefore take this opportunity to draw attention to this matter so that the legislature is on notice about these potential policy matters.

I

I begin by making clear what this court does and does not decide in the present case. The *only* question before this court is whether a voluntary conservatorship creates a relationship of joint authority, such that a voluntarily conserved[1] person may continue to manage her affairs as she is able. It is on this basis that the defendant First State Fiduciaries, LLC, challenges the Appellate Court's conclusion that Susan D. Elia lacked the legal authority to create the Delaware irrevocable trust. It is important to underscore that the Appellate Court's holding, and, in turn, this certified appeal, rests on an unchallenged assumption, namely, that the former conservator of Elia's estate, Renee F. Seblatnigg, had the authority to create the Delaware irrevocable trust, subject to meeting the conditions prescribed in General Statutes (Rev. to 2011) § 45a-655 (e). After all, if the conservator lacked such authority, there would be no issue of joint authority. If we were so permitted, there would be several reasons to question this assumption, which appears to be the sole impediment to Elia's legal authority to create the irrevocable trust.

---

[1] For consistency with the majority opinion, I also refer to a voluntarily represented person as "voluntarily conserved," mindful that such persons do not fall within the definition of a conserved person and have not been found by a court to be incapable of managing their affairs. See General Statutes § 45a-644 (g) and (h); General Statutes (Rev. to 2011) § 45a-646.

Day *v.* Seblatnigg

The majority opinion recognizes that involuntarily conserved persons have the statutory right to retain exclusive authority over those matters that they are capable of managing, with or without support from a source other than a conservatorship. See General Statutes (Rev. to 2011) § 45a-650 (k) and (*l*) (now § 45a-650 (*l*) and (m), respectively). The statutory scheme suggests; see General Statutes (Rev. to 2011) § 45a-646; and logic dictates that voluntarily conserved persons similarly can obtain a limited conservatorship. They may do so by simply designating in their application for voluntary representation which specific matters should be delegated to the conservator, thus retaining exclusive authority over all undesignated matters.[2] The standard Probate Court form for such applications provides a field to make such limited designations. See Petition/Voluntary Representation by Conservator, Form PC-301, p. 2 (last modified January, 2021), available at www.ctprobate.gov/Forms/PC-301.pdf (last visited January 20, 2022) ("I would like a conservator appointed to assist me with the following financial matters"). Elia did not make such a limited designation in her application.

There would be no need for Elia to make such a limited designation, however, if her broad grant of authority to manage her estate did not include the authority to create the irrevocable trust and to fund it with a transfer of funds from her revocable trust. Two theories might support such a proposition.

First, certain matters cannot be delegated to the conservator. See, e.g., 39 Am. Jur. 2d 113, Guardian and Ward § 117 (2008) ("[a]s a general rule, a guardian may not waive legal rights on behalf of [the guardian's] ward,

___

[2] The exercise of such authority may nonetheless be rendered void if it is demonstrated that the voluntarily conserved person lacked the requisite mental capacity to undertake the act in question. See, e.g., 1 Restatement (Third), Trusts § 11, comment (e), pp. 162–63 (2003).

Day *v.* Seblatnigg

surrender or impair rights vested in the ward or impose any legal burden thereon, or exercise purely personal elective rights of [the guardian's] ward'' (footnotes omitted)); see also, e.g., *Newman* v. *Newman*, 42 Ill. App. 2d 203, 213, 191 N.E.2d 614 (1963) (''certain powers, rights, or elections may be so personal that they cannot be exercised on behalf of an incompetent [by a conservator]''); *Estate of Townson ex rel. East Tennessee Human Resources Agency* v. *Estate of East ex rel. Cooley*, 297 S.W.3d 736, 738 (Tenn. App. 2009) (conservator ''has no authority to exercise an elective right or power of the conservatee'' (internal quotation marks omitted)), appeal denied, Tennessee Supreme Court, Docket No. E2008-00689-SC-R11-CV (August 31, 2009).

The execution of a testamentary instrument, designating how and to whom the conserved person's assets will be distributed upon his or her death, is one such matter. See generally 1 Restatement (Third), Trusts § 11, comments (a) through (d), pp. 160–62 (2003) (addressing testamentary capacity of persons under conservatorship). Authority to make testamentary dispositions for the conserved person cannot be delegated to the conservator both because such rights are purely personal and because the conservator's authority extends only to the lifetime interests (support and care) of the conserved person. See, e.g., *Citizens State Bank & Trust Co. of Hiawatha* v. *Nolte*, 226 Kan. 443, 449, 601 P.2d 1110 (1979) (''[A conservator's duty] is to manage the estate during the conservatee's lifetime. It is not his function, [or] that of the [P]robate [C]ourt supervising the conservatorship, to control disposition of the conservatee's property after death.''); *In re Estate of Briley*, 16 Kan. App. 2d 546, 549, 825 P.2d 1181 (1992) (recognizing that right to change beneficiary of account ''is a purely personal elective right of the conservatee'' and that ''[t]he decision regarding distribution of the conservatee's property after death belongs to the con-

Day *v.* Seblatnigg

servatee''); see also, e.g., *In re Estate of Garrett*, 81 Ark. App. 212, 218, 100 S.W.3d 72 (2003) (stating that will making requires " 'personal performance' " and thus cannot be delegated).

The majority properly declines to address whether Elia had the testamentary capacity to create the irrevocable trust because that issue was neither preserved[3] nor adequately briefed. See footnote 18 of the majority opinion and accompanying text. Review of the trial court record reveals that the irrevocable trust is not, strictly speaking, a testamentary trust. It was not created by a will; see, e.g., 1 Restatement (Third), supra, § 17, p. 250; see also, e.g., Public Acts 2021, No. 21-39, § 1 (effective January 1, 2022), to be codified at General Statutes (Supp. 2022) § 45a-499c (29); and it vested discretion in the trustees to make distributions in any amount during Elia's lifetime to Elia, her grandchildren, or any charitable institute. See, e.g., *Cate-Schweyen* v. *Cate*, 303 Mont. 232, 239–40, 15 P.3d 467 (2000) ("A testamentary trust . . . not only must comply with the statutory requirements for a will, but also must take effect only upon the testator's death. . . . Therefore, a testamentary disposition is usually incompatible with a trust established by a trustor who retains a life interest, as a beneficiary of the trust, although a new beneficiary or beneficiaries acquire an interest upon the trustor's death." (Citations omitted; internal quotation marks omitted.)) Whether such a trust should be characterized for present purposes as a purely testamentary act, a partially testamentary act requiring concurrent action by the conservator and conserved person, or not

---

[3] As the majority notes, the defendant had cast the question before the Appellate Court as a question of Elia's capacity to contract, and that court viewed it as such. See footnote 18 of the majority opinion. I note that there is authority indicating that the creation of a trust is not contractual in nature. See, e.g., *Tunick* v. *Tunick*, 201 Conn. App. 512, 525–26, 242 A.3d 1011 (2020), cert. denied, 336 Conn. 910, 244 A.3d 561 (2021); see also id. (citing authorities).

Day *v.* Seblatnigg

a testamentary act at all is a difficult issue best left to
a case in which it is the subject of adversarial briefing.
The unfortunate effect of the present case is that Elia
may have had testamentary capacity when she created
the irrevocable trust and, yet, her trust assets will not
be distributed in accordance with her wishes following
her death, which occurred during the pendency of this
appeal.

The second theory that might excuse the need for
Elia to make a limited designation of authority to her
conservator to reserve her right to create the irrevoca-
ble trust would depend on whether such a right is
encompassed in the authority to manage the conserved
person's "estate." General Statutes (Rev. to 2011) § 45a-
655 (a). If a conserved person's present interest in a
trust is not part of the conservatorship estate, a good
argument could be made that Elia retained the authority
to create and fund a trust, as long as she did not use
assets of her estate to do so.[4] In the absence of evidence
that Elia lacked the mental capacity to make decisions
with regard to her trusts, she would retain the legal
capacity to revoke or modify the Connecticut revocable
trust, to create the Delaware irrevocable trust, and to
request that the trustee of her revocable trust—who
also happened to be her conservator—transfer funds
to the irrevocable trust.

This theory finds some support in both the statutory
text and case law.[5] The only explicit discussion of trusts

---

[4] The defendant pointed out in its memorandum in support of its motion
to strike the complaint filed by the plaintiff, Margaret E. Day, coconservator
of Elia's estate, that the schedule to the trust instrument recited that $1
was the property conveyed to the irrevocable trust at the time of its establish-
ment, and that the complaint made no allegation that this sum came from
conservatorship estate assets. The trial court did not rule on this motion,
filed well after the plaintiff filed her motion for summary judgment, and the
defendant's appellate briefs appear to assume that the irrevocable trust was
funded by a transfer from the revocable trust.

[5] There is an indication in the trial court record that Elia and the Probate
Court judge who granted her application for representation did not view

Day *v.* Seblatnigg

in the conservatorship scheme is in General Statutes
(Rev. to 2011) § 45a-655 (e). That subsection prescribes
conditions for "transfers of income and principal from"
the conserved person's estate to a trust, existing or
created by the conservator. General Statutes (Rev. to
2011) § 45a-655 (e). The word "from" suggests that the
transfer depletes assets of the estate by directing them
to a source outside the estate. If an existing trust or a
new trust created by the conservator into which income
was transferred was part of the estate, the transfer
would be "within" or "to" the estate, not "from" the
estate.[6]

This court's decision in *Dept. of Social Services* v.
*Saunders*, 247 Conn. 686, 724 A.2d 1093 (1999), lends
support to this view. The issue in that case was "whether

the revocable trust to be part of the estate. One of the defendant's filings
in opposition to the motion for summary judgment recited an exchange that
purportedly occurred at a Probate Court hearing at which Elia's children
unsuccessfully sought to have Elia found incapable of managing her affairs
and involuntarily conserved. At that proceeding, a question was raised about
the omission of Elia's revocable trust from Seblatnigg's inventory of the
estate. Both the judge and Elia's counsel made comments indicating that
they understood the revocable trust to be outside the conservatorship estate
and, thus, properly excluded from the inventory required under § 45a-655
(a). The defendant did not renew this argument in its Appellate Court brief,
and nothing in the record indicates how or whether the plaintiff responded
to this argument before the trial court.

[6] The trial court concluded that the revocable trust assets were part of
the conservatorship estate, pointing to the conservator's duty under § 45a-
655 (a) to include "equitable present interest[s]" in an inventory of the
conserved person's estate and the uncontested fact that Elia held an equita-
ble interest in the Connecticut revocable trust. Even if we assume that the
conservator has the duty to include trust assets in the inventory, I do not
view that fact as dispositive of the question of whether the trust is part of
the estate, subject to the conservator's management. Cf. *In re Conservator-
ship of Addison* v. *Touchstone*, 242 So. 3d 926, 935–36 (Miss. App. 2018)
("joint accounts created prior to the [ward's] incapacity [are] not subject
to being marshalled by the conservator, although the funds may be used if
necessary to pay for the care and expenses of the ward during his lifetime"
(internal quotation marks omitted)). If trusts are part of the estate, however,
that would raise the question of whether a transfer of funds from one trust
to another would be a transfer "from" the estate.

Day *v.* Seblatnigg

the Probate Court was authorized to permit a conserva-
trix to establish an irrevocable inter vivos trust funded
with the net proceeds recovered in the settlement of a
negligence action filed on her ward's behalf, which
would not be considered an available resource for the
purpose of determining ongoing [M]edicaid eligibility.''
Id., 687. The Superior Court decision answering that
question in the negative, which this court reversed on
appeal, was in fact the impetus for the 1998 amendment
to General Statutes (Rev. to 1997) § 45a-655 (e) expressly
authorizing such an act. See id., 697, 702–704, 715. This
court's decision in *Saunders* is noteworthy for its recog-
nition of the effect of the transfer on the estate and on
the conservator's control of the transferred assets. The
plaintiff department characterized the transfer into the
trust as an act that had ''divest[ed] the estate by transfer-
ring its assets to an inter vivos trustee''; id., 709; and
''eliminate[d] [the ward's] estate in its entirety and trans-
fer[red] it to a trustee.'' (Internal quotation marks omit-
ted.) Id. The court in *Saunders* accepted this premise
but nonetheless viewed the Probate Court's permission
for the conservator to create the trust to be a proper
exercise of that court's authority because the trust
assets were still available for the ward's care and sup-
port through his exclusive equitable interest and that
court would have jurisdiction over both the trustee and
the conservator. See id., 709–12. In *Saunders*, this court
also rejected the plaintiff department's argument that
the transfer of the ward's assets to the trust ''would
constitute an improper delegation of the Probate
Court's responsibility, acting through the conservator,
to manage [the ward's] estate'' because the Probate
Court has ''plenary authority to manage a ward's estate''
but only limited authority to ''review actions of a trustee
of an inter vivos trust . . . .'' Id., 710. This court
acknowledged that the conservator's authority in rela-
tion to the trust would be limited to the management

Day *v.* Seblatnigg

of funds distributed by the trustees, who would actually manage the trust in accordance with the terms of the trust instrument.[7] See id., 710–11; see, e.g., *Ramsdell* v. *Union Trust Co.*, 202 Conn. 57, 70, 519 A.2d 1185 (1987) ("the duties of the conservator and those of the trustees, and the potential liabilities arising from the breaches of these duties, are completely distinct"); see also, e.g., 1 Restatement (Second), Trusts § 175, comment (f), p. 381 (1959) ("[t]he duty of the trustee is not only to take and keep control, but to take and keep exclusive control"); R. Folsom & L. Beck, Connecticut Estates Practice Series: Drafting Trusts in Connecticut (2d Ed. 2021) § 1:15, p. 16 (explaining that statutes and legal principles "[suggest] that the [c]onservator should not have authority to exercise the [g]rantor's right to revoke or amend the trust").

There may well be persuasive counterarguments. The questions of whether trusts are part of the estate, subject to the conservator's management, and, if not, whether Elia retained the legal authority to create the irrevocable trust are not, however, properly before this court. The defendant did argue before the Appellate Court that the assets in the revocable trust were not part of the conservatorship estate but made no argument that this fact had any bearing on the question of Elia's legal authority to create the irrevocable trust. See *Day* v. *Seblatnigg*, 186 Conn. App. 482, 506 n.10, 199 A.3d 1103 (2018). The Appellate Court reasonably construed the defendant's argument to be related exclusively to the question of whether Seblatnigg had the legal authority to *transfer* the revocable trust assets and determined that it was unnecessary to address that argument in light of its conclusion that Elia lacked legal

---

[7] I am not suggesting that the conservator would lack authority to request a distribution from the trust for the conserved person's support in accordance with the terms of the trust or to file an action on the conserved person's behalf to compel the trustees to meet their fiduciary obligations.

Day *v.* Seblatnigg

authority to *create* the irrevocable trust. See id. The defendant did not argue in its petition for certification to appeal to this court that the Appellate Court improperly had failed to reach this issue because it was directly connected to the question of whether Elia had authority to create the irrevocable trust.[8] We therefore must leave to another day the questions of whether trusts are part of the conservatorship estate and, if not, whether a conserved person retains exclusive authority to create and fund trusts with assets that are not part of the conservatorship estate.

II

I also take this opportunity to highlight the possibility that the legislature may wish to consider revisions to the conservatorship scheme as it applies to voluntary representation, which was not directly considered in the 2007 reforms.

As the majority explains, it is not uncommon for persons seeking voluntary representation to have the same degree of incapacity as involuntarily conserved persons, whether at the time the application is submitted or sometime thereafter. See, e.g., Conn. Joint Standing Committee Hearings, Judiciary, Pt. 1, 1977 Sess., p. 190, testimony of Probate Judge Bernard F. Joy; see also, e.g., Public Acts 1987, No. 87-87. This fact would suggest that some members of the former class may be equally vulnerable to some of the abuses that prompted the 2007 reforms. Yet, because the statutory definition

---

[8] The defendant petitioned this court for certification of two issues: (1) whether the Appellate Court correctly determined that Elia did not retain any control over her estate; and (2) whether "the *trial court* err[ed] when it concluded that [General Statutes (Rev. to 2011)] § 45a-655 (e), a statute directed solely to the conduct of conservators, applied to the conduct of a voluntarily conserved person." (Emphasis added.) We granted certification, limited to the first issue. See *Day* v. *Seblatnigg*, 331 Conn. 913, 204 A.3d 702 (2019); see also footnote 5 of the majority opinion (reframing certified question).

Day *v.* Seblatnigg

of a "conserved person" includes only involuntarily conserved persons; see General Statutes § 45a-644 (h); it appears that protections available in involuntary conservatorships are unavailable in voluntary conservatorships. Those protections include the right to clear notice of the legal consequences of the appointment of a conservatorship, including the fact that conserved persons "will lose some of [their] rights"; (internal quotation marks omitted) General Statutes § 45a-649 (b); the right to appointed counsel, the right to have the Probate Court ascertain whether the applicant has the capacity to retain certain rights, and the right to periodic judicial review of the conservatorship to ascertain whether the court should modify or terminate the conservatorship. See General Statutes §§ 45a-649 (d), 45a-649a, 45a-650 (m) and 45a-660 (c). The only right provided to the person in a proceeding for voluntary representation, other than to be present and heard, is that the court shall "[explain] to the [applicant] that granting the petition will subject the [applicant] or the [applicant's] property . . . to the authority of the conservator . . . ." General Statutes § 45a-646.

Perhaps not all of the procedural protections afforded to involuntarily conserved persons are necessary when the conservatorship is being requested, rather than imposed, and the voluntarily conserved person has the distinct right to terminate the conservatorship at will, with thirty days notice. See General Statutes § 45a-647. But the present case illustrates the pitfalls of the lack of any explicit procedural requirements. The Probate Court made no effort to ascertain what authority, if any, Elia wanted to retain or what limits, if any, she wanted to place on her conservatorship. The court's explanation of the legal consequences of the appointment of a conservator of Elia's estate; see footnote 13 of the majority opinion; could have misled Elia to believe that she retained authority over her entire estate

Day *v.* Seblatnigg

and had given Seblatnigg authority only to act as her agent under a relationship of joint authority. Hopefully, this court's opinion in this case will provide clearer direction on that matter.